[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-14611
_____

D.C. Docket No. 1:13-cv-21286-WPD


SANTIAGO ALVAREZ,

                                        Plaintiff - Appellant,

versus

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, FELICIA SKINNER,
Field Office Director,
U.S. IMMIGRATION & CUSTOMS ENFORCEMENT, MICHAEL GLADISH
Office of Detention and Removal, Atlanta District,
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, JUAN CARLOS
MUNOZ,
UNITED STATES ATTORNEY, ROBERT EMERY,
UNITED STATES ATTORNEY, SHEETUL S. WALL,
UNITED STATES OF AMERICA,

                                        Defendants - Appellees,

UNIDENTIFIED OFFICIALS AND/OR AGENTS OF
DEPARTMENT OF HOMELAND SECURITY, et al.,

                                        Defendants.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(March 24, 2016)

Before MARCUS, WILLIAM PRYOR, and JILL PRYOR, Circuit Judges.

MARCUS, Circuit Judge:

Santiago Alvarez, a Cuban national and longtime United States resident, was serving the last few weeks of a federal prison sentence when United States Immigration and Customs Enforcement ("ICE") lodged a detainer against him. Alvarez was ordered removed and, although ICE does not effectuate removals to Cuba, he remained in ICE custody from November 25, 2008 until October 21, 2009 -- an amount of time greatly exceeding the 90-day statutory period for removal. 8 U.S.C. § 1231(a)(1)(A). After Alvarez was released, he filed this Bivens action, arguing that various government officials, knowing that his removal order could not be executed, made false statements in order to unconstitutionally prolong his detention.

The district court dismissed his complaint in its entirety, first finding that it did not have subject matter jurisdiction over the claim pursuant to 8 U.S.C. § 1252(g) -- which strips the federal courts of jurisdiction over claims "arising from the decision or action by the Attorney General to commence proceedings,

2

adjudicate cases, or execute removal orders against any alien." The court also found that, even if jurisdiction was proper, several other grounds supported its dismissal. Among other things, the district court concluded that no Bivens extension would be warranted to remedy an extensive immigration detention because an adequate, statutory remedial scheme already exists and several special factors counsel hesitation.

After thorough review, we affirm. Although we hold that § 1252(g) does not bar us from considering the merits of Alvarez's claim, we also find that no Bivens remedy is available to him, both because the Immigration and Nationality Act sets out sufficient meaningful remedies for Alvarez and similarly situated aliens, and because numerous special factors counsel against supplementing this scheme with a new judicially created cause of action. Notwithstanding having legislated substantially and repeatedly in this area, Congress did not provide an avenue by which Alvarez can seek monetary relief. We defer to its judgement and hold that no Bivens remedy is available to a plaintiff who claims that immigration officials unconstitutionally prolonged his detention.

## I.

### A.

The essential facts are these. Santiago Alvarez is a Cuban national who was admitted to the United States as a lawful permanent resident in 1959. He lived

3

primarily in Miami-Dade County, and he worked for the Central Intelligence Agency and the United States military between 1960 and 1968.  Alvarez also has a criminal history that dates back to 1990, when he was convicted of aggravated assault and battery with a gun after he assaulted a repossession agent who mistakenly attempted to tow his vehicle.  In November 2005, Alvarez was arrested and charged again, this time with possessing illegal weapons for the benefit of anti-Castro activists outside of the United States.  He subsequently pled guilty to federal weapons charges, including conspiracy to unlawfully possess machine guns and a grenade launcher.

Throughout the course of the plea negotiations, Alvarez's attorneys voiced concerns that a guilty plea to federal weapons charges would affect his immigration status.  The Department of Justice assured counsel that Cubans -- particularly Cubans like Alvarez with a documented history of opposing Castro's regime -- are not deported to Cuba.  The government agreed as a condition of the final plea agreement "to utilize its best efforts" to communicate with ICE officials and "to reach a definitive understanding of [Alvarez's] immigration status and the effect of this case on his immigration status."

Alvarez was initially sentenced to 46 months' imprisonment, although his sentence was subsequently reduced to 30 months when he assisted the government by arranging an anonymous turnover of various weapons.  During the sentencing

4

hearing, the judge described Alvarez and his co-defendants as "by all accounts . . . compassionate, benevolent, and patriotic, not only to Cuba but to the United States."

Alvarez served the first several months of his sentence in a federal prison, and he was due to be moved to a halfway house in November 2007 to serve the duration of his term. In August 2007, however, ICE lodged an immigration detainer against Alvarez with the Federal Bureau of Prisons. Alvarez filed a motion under 28 U.S.C. § 2255 in the Southern District of Florida, asking the court to lift the detainer, claiming that the government had breached the terms of his plea agreement by failing to use its best efforts to reach a timely resolution of his immigration status.

A magistrate judge conducted a hearing on the motion and questioned ICE's counsel, Assistant United States Attorney Robert Emery, about whether or not Alvarez's deportation was a realistic possibility. The magistrate judge asked: "If in fact the Defendant can not [sic] be deported back to Cuba, why is it that you would keep him in custody for several months if there is no way he's going to be able to be deported?" Emery responded that the Immigration and Nationality Act allowed the government to deport Alvarez to a third country. The magistrate judge then inquired whether any Cuban national had ever been deported to a third country, and whether it was conceivable that any other country would accept Alvarez.

5

Emery said that he did not know but that the court ought to allow ICE to take the full statutory 90-day period to investigate whether it would be possible to remove him.  The court commented, "maybe it is a collateral issue, but it does smack of unnecessarily punitive if at the end of the day you are going to cut him loose and you're going to say, 'well, there is no place we could deport him.'" Ultimately, however, the magistrate judge recommended that Alvarez's motion be denied because Alvarez had sworn at his plea hearing that he understood that his guilty plea could result in his deportation.  Additionally, the judge pointed out that the decision to detain or release Alvarez fell within ICE's discretion.  The district court adopted the magistrate judge's Report and Recommendations, and as a result, Alvarez remained in custody.

Sometime after the § 2255 hearing, Alvarez was summoned to appear before a federal grand jury in the Western District of Texas.  The government sought Alvarez's testimony that he had helped an individual illegally enter the United States.  Alvarez refused to testify and was charged with obstruction of justice, in violation of 18 U.S.C. §§ 1503, 6002, and 6003.  He pled guilty and was sentenced to an additional ten months in prison.  As a result of the new conviction and sentence, Alvarez was scheduled to be released from federal custody on November 25, 2008.

In the time leading up to Alvarez's release date, his attorneys attempted to work with Emery to enter a stipulated final order of removal. Pursuant to 8 U.S.C. § 1231(a)(1)(A), "when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days." An alien can be ordered removed in two ways: (1) he can be ordered removed by an immigration judge ("IJ") after a removal proceeding, see 8 U.S.C. § 1229a(a)-(c); or (2) ICE and the alien can stipulate that the alien is removable and the IJ can enter a stipulated order that serves as "a conclusive determination of the alien's removability," id. § 1229a(d). Here, if ICE had agreed to stipulate that Alvarez was removable, the statutory period to remove him would have begun on or around his prison release date. Although it initially appeared that the parties had reached such an agreement, Emery withdrew the offer to stipulate removability one week before Alvarez's November 25 release date, and a removal hearing was scheduled for January 22, 2009. Thus, the statutory 90-day removal period did not begin to run in this case until Alvarez had spent an additional two months in ICE custody.

After Alvarez was ordered removed at the hearing, his attorneys contacted Felicia Skinner, the Field Office Director of the Atlanta Office of Detention and Removal. They pointed out that Alvarez could not be removed to Cuba and requested that ICE expedite his review process. Skinner declined to expedite review, and on the last day of the 90-day period, April 22, 2009, she issued a First

7

Decision to Continue Detention. Skinner said that there was "no reason to believe that [Alvarez's] removal will not take place within the reasonably foreseeable future." She also found that Alvarez should be detained until that time because he was both a danger to his community and a flight risk. Skinner notified Alvarez that if he was not removed by July 21, 2009, jurisdiction over his removal would be "transferred to the Headquarters Case Management Unit." No action was taken on Alvarez's removal in the intervening period.

On July 28, 2009, Alvarez filed a petition for a writ of habeas corpus in the United States District Court for the Middle District of Georgia, pursuant to 28 U.S.C. § 2241. On September 17, 2009, ICE filed a motion for an extension of time. The motion, filed by Assistant United States Attorney Sheetul Wall, stated that the government was no longer seeking to remove Alvarez to Cuba, but was actively pursuing his deportation to Spain. This application was accompanied by a declaration from Michael Gladish, an ICE Supervisory Detention and Deportation officer, which left the impression that deportation to Spain was a realistic and foreseeable option because Alvarez was eligible for Spanish citizenship. In the affidavit, Gladish claimed that, as a result of a "recent change" in Spanish law, foreign nationals with Spanish ancestors could apply for citizenship. Gladish affirmed that Alvarez's paternal grandfather had been a national and citizen of Spain. Gladish also stated that Alvarez had been given, and promised to complete,

8

an application for Spanish citizenship. The district court granted the extension, giving the government three more months to respond.

Alvarez moved for reconsideration of the district court's order, arguing, among other things, that he was clearly ineligible for Spanish citizenship. In a sworn affidavit, Alvarez stated that ICE officials had given him two pages of a nine-page application for Spanish citizenship and asked him to fill them out. The missing application pages made clear that the citizenship opportunity extended only to individuals whose ancestors had fled the Spanish Civil War, which took place between 1936 and 1939. Alvarez claimed that, when he learned this, he knew he was ineligible for citizenship because his grandfather had emigrated from Spain around 1875. He immediately informed a deportation officer -- who is not named as a defendant -- on September 14.

As a result of Alvarez's motion, the district court rescinded the order and set the matter down for a hearing on October 26, 2009. After the hearing was set, Acting Headquarters Case Management Unit Chief Juan Munoz issued a Second Decision to Continue Detention on October 14, 2009. In it, Munoz acknowledged that although Alzarez's removal to Cuba was not "presently possible," ICE was working to secure his removal to Spain. Munoz explained that there was no reason to believe that Alvarez's removal would not occur in the reasonably foreseeable future. But on October 21, 2009 -- approximately 11 months after Alvarez was

first transferred to ICE custody -- ICE officials notified him that he was being released.  The government then moved to dismiss his habeas proceeding as moot, but the court denied the motion.  The district court held a hearing and found:

> There is no dispute in the record that at all times all parties hereto knew that Petitioner Alvarez was not removable to Cuba, that there was no repatriation agreement between Cuba and the United States, and that Petitioner's removal to Cuba would not be in the reasonably foreseeable future.  Nonetheless, repeated requests that Petitioner Alvarez be released after January 22, 2009, were denied.

The court also found that by releasing Alvarez, "ICE had tacitly admitted . . . that its [earlier] determination that Petitioner Alvarez was a threat to the community and a flight risk was no longer a valid determination" -- and therefore that those grounds were "obviously no basis for illegal indefinite detention."  For these reasons, the district court retroactively granted Alvarez's petition, effective October 21, 2009.  The court also struck several conditions of Alvarez's release as unconstitutional -- although this Court reversed that determination in Alvarez v. Holder, 454 F. App'x 769 (11th Cir. 2011) (per curiam).[1]  On appeal, the panel found that the district court had properly exercised jurisdiction over the petition

---

[1] The district court had found that the condition that Alvarez not travel 50 miles beyond his residence would deny him access to the courts in the Middle District of Georgia and prevent him from appearing for his habeas action and any future suits.  The court also struck the requirement that Alvarez abstain from all contact with eleven enumerated individuals.  Next, the court struck a provision requiring Alvarez to "make good faith and timely efforts to obtain a travel document to effectuate [his] removal" -- concluding that an alien has no obligation to effectuate his own removal.  Finally, the trial court struck a provision reserving ICE's right to modify the terms of Alvarez's release at any time.  The district court sua sponte reinstated the condition providing that Alvarez may not contact the named individuals.  Alvarez, 454 F. App'x at 773-74.

10

because Alvarez was still technically in custody, facing a variety of release conditions, but it reinstated all of the conditions that the lower court had invalidated.  Id.

## B.

Alvarez subsequently commenced this lawsuit against various federal officials involved in continuing his detention in the United States District Court for the Southern District of Florida.  He amended his complaint several months later, ultimately asserting Bivens claims against five defendants: (1) Robert Emery, the Assistant U.S. Attorney who declined to lift Alvarez's detainer or agree to a stipulated order of removal; (2) Felicia Skinner, the Field Office Director of the Atlanta Office of Detention and Removal who issued the First Decision to Continue Detention; (3) Sheetul Wall, the Assistant U.S. Attorney who filed the motion for an extension of time to respond to Alvarez's habeas petition; (4) Michael Gladish, the ICE Supervisory Detention and Deportation officer whose declaration regarding Alvarez's eligibility for Spanish citizenship was attached to Wall's motion; and (5) Juan Munoz, the Acting Headquarters Case Management Unit Chief who issued the Second Decision to Continue Detention days before Alvarez was released.  Alvarez brought claims for (1) "Conspiracy to prolong [his] release and to violate his fundamental right to freedom and liberty," (Count I); (2) "Violation of [his] Fourth Amendment right against unreasonable seizure," (Count

11

II); and (3) "Violation of [his] Fifth Amendment right to due process and liberty," (Count III).[2]

The individual defendants moved to dismiss the case for failure to state a claim, and the district court granted the motion, articulating various grounds for its decision. As we have noted, the court first found that it did not have subject matter jurisdiction over Alvarez's claim as a result of the jurisdiction stripping provision contained in the Immigration and Nationality Act, 8 U.S.C. § 1252(g). Next, it concluded that, in the alternative, the claims were barred by the two-year statute of limitations in Georgia -- the state with the most significant relationship to the suit. It also found that the Supreme Court's decision in Heck v. Humphrey, 512 U.S. 477, 487 (1994), barred the claims. The district court then concluded that no Bivens remedy should be recognized in this context because the Immigration and Nationality Act provides an adequate alternative remedy and several special factors counsel against extending Bivens into the immigration context. The trial court also determined that, even if it were to decide the case on the merits and find that the defendants had violated Alvarez's constitutional rights, each official was entitled to qualified immunity because Alvarez had failed to sufficiently allege the violation

---

[2] Alvarez also asserted other claims not at issue on appeal: "Fraud in immigration proceedings and upon [the] court" (Count IV); "Deprivation of [his] freedom and liberty because of his political beliefs (Count V); False imprisonment (Count VI); Malicious prosecution (Count VII); and Intentional infliction of emotional distress (Count VIII). He subsequently conceded that he had failed to state a claim in Count V. As for the state law tort claims, the government moved to dismiss them, but withdrew its motion in light of the district court's ruling that it lacked subject matter jurisdiction.

12

of a clearly established right.  Finally, as for two of the defendants, attorneys Emery and Wall, the court concluded that they were entitled to absolute immunity because their actions were intimately associated with the judicial process.

This timely appeal followed.

## II.

We review the dismissal of a plaintiff's Bivens claim under Federal Rule of Civil Procedure 12(b)(6) and for lack of subject matter jurisdiction de novo.  Lee v. Hughes, 145 F.3d 1272, 1274 (11th Cir. 1998).  We must accept the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff.  Hardison v. Cohen, 375 F.3d 1262, 1263 (11th Cir. 2004).  We are free to affirm the district court's dismissal on "any ground that is supported by the record."  United States v. Elmes, 532 F.3d 1138, 1142 (11th Cir. 2008); see also Lee, 145 F.3d at 1277 n.6 ("[T]he district court was incorrect to conclude that it lacked subject matter jurisdiction, but was correct to dismiss for failure to state a claim.  We therefore affirm the district court's judgment." (citation omitted)).

## III.

This Court is obliged to address first whether we have jurisdiction to consider the merits of Alvarez's claims.  We have long recognized that "in the federal tandem, jurisdiction takes precedence over the merits.  Unless and until jurisdiction is found, both appellate and trial courts should eschew substantive

13

adjudication." Belleri v. United States, 712 F.3d 543, 547 (11th Cir. 2013) (alterations adopted) (quoting Opelika Nursing Home, Inc. v. Richardson, 448 F.2d 658, 667 (5th Cir. 1971)); see also Univ. of S. Ala. v. Am. Tobacco Co., 168 F.3d 405, 410 (11th Cir. 1999) ("A necessary corollary to the concept that a federal court is powerless to act without jurisdiction is the equally unremarkable principle that a court should inquire into whether it has subject matter jurisdiction at the earliest possible stage in the proceedings."). "The jurisdiction of a court over the subject matter of a claim involves the court's competency to consider a given type of case," and to allow parties to obtain adjudications on the merits where subject matter jurisdiction does not exist would "'work a wrongful extension of federal jurisdiction and give [federal] courts power the Congress denied them.'" Jackson v. Seaboard Coast Line R.R. Co., 678 F.2d 992, 1000 (11th Cir. 1982) (quoting Am. Fire & Cas. Co. v. Finn, 341 U.S. 6, 18 (1950)). In short, if Congress has stripped us of jurisdiction over Alvarez's claims, then our inquiry is at an end.

The district court concluded that it lacked jurisdiction over Alvarez's Bivens claims pursuant to 8 U.S.C. § 1252(g), which provides:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

14

Id. (emphasis added).  The difficulty in interpreting this provision is that "Congress has provided no explicit definition of the phrase 'arising from,' and courts have not always agreed on its plain meaning."  Humphries v. Various Fed. USINS Emps., 164 F.3d 936, 943 (5th Cir. 1999).  Congress also has not defined "commence proceedings," "adjudicate cases," or "execute removal orders."  We begin with first principles: for ICE "to prevail [on jurisdictional grounds] it must overcome . . . the strong presumption in favor of judicial review of administrative action."  INS v. St. Cyr, 533 U.S. 289, 298 (2001).  Indeed, the Supreme Court has long cautioned "that where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear."  Webster v. Doe, 486 U.S. 592, 603 (1988); accord Demore v. Kim, 538 U.S. 510, 517 (2003); see also Johnson v. Robison, 415 U.S. 361, 373-74 (1974) ("[N]either the text nor the scant legislative history of [the provision] provides the 'clear and convincing' evidence of congressional intent required by this Court before a statute will be construed to restrict access to judicial review.").

Moreover, the Supreme Court's decision in Reno v. American-Arab Anti-Discrimination Committee (AADC), 525 U.S. 471 (1999), further counsels in favor of reading § 1252(g) narrowly.  In American-Arab Anti-Discrimination Committee, the petitioners were resident aliens ordered

15

removed on the basis of routine immigration violations under circumstances that suggested they had been targeted for removal on account of their membership in a group advocating the creation of an independent Palestinian state.  See id. at 473-74.  They brought a selective enforcement claim against the Immigration and Naturalization Service ("INS"), and the Supreme Court considered whether § 1252(g) barred the federal courts from reaching the merits of the group's claim.  Id. at 473-76.

Although the parties assumed that § 1252(g) applied to "all or nearly all deportation claims," the Supreme Court rejected this interpretation.  Id. at 478.  The provision, the Court observed, does not say "no judicial review in deportation cases unless this section provides judicial review."  Id. at 482.  Rather, it is drawn in a "much narrower" way and "applies only to three discrete actions," namely, the "'decision or action' to 'commence proceedings, adjudicate cases, or execute removal orders.'"  Id. (quoting 8 U.S.C. § 1252(g)).  Thus, for example, the provision has no effect on a variety of other actions that may be taken before, during, and after removal proceedings -- "such as the decisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final order that is the product of the adjudication, and to refuse reconsideration of that order."  Id.

16

The Court also emphasized, however, that "[t]here was good reason for Congress to focus special attention upon, and make special provision for, judicial review of the Attorney General's discrete acts of commencing proceedings, adjudicating cases, and executing removal orders." Id. at 483 (alterations adopted) (internal quotation marks and citation omitted). These three actions "represent the initiation or prosecution of various stages in the deportation process," and "[a]t each stage the Executive has discretion to abandon the endeavor" for any number of reasons. Id. The Court noted that the agency's discretionary termination of the removal process for certain aliens had inadvertently "opened the door to litigation in instances where the INS chose not to exercise it." Id. at 484. Thus, § 1252(g) "seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations." Id. at 485. It further described the provision as "specifically directed at the deconstruction, fragmentation, and hence prolongation of removal proceedings." Id. at 487. Applying these principles to the petitioners' selective enforcement claims, the Supreme Court dismissed their suit -- concluding that, at bottom, the claims amounted to a challenge to the Executive branch's decision to commence proceedings. Id.

17

Although American-Arab Anti-Discrimination Committee does not answer the question of whether we have jurisdiction over Alvarez's claim, it does guide our inquiry. Notably, it instructs us to narrowly interpret § 1252(g) -- a command that our sister circuits have applied in subsequent cases. Thus, for example, the Seventh Circuit has explained that the provision only includes within its scope those challenges that ask the district court, and ultimately the court of appeals, "to block a decision 'to commence proceedings, adjudicate cases, or execute removal orders.'" Parra v. Perryman, 172 F.3d 954, 957 (7th Cir. 1999) (quoting 8 U.S.C. § 1252(g)). In its view, § 1252(g) is no impediment to adjudicating claims that challenge "detention while the administrative process lasts." Id.; accord Carrera-Valdez v. Perryman, 211 F.3d 1046, 1047 (7th Cir. 2000) ("Carrera did not ask the district court to block the commencement or adjudication of a case, nor did he protest the execution of a removal order. . . . Carrera wants review of his placement pending his transfer to another nation, and nothing in § 1252(g) precludes review of the decision to confine Carrera until then."); see also Zhislin v. Reno, 195 F.3d 810, 814 (6th Cir. 1999) ("Zhislin . . . challenges neither the constitutionality of the deportation order nor the right of the Attorney General to execute the order. All that [he] is challenging is the right of the Attorney General to detain him

18

indefinitely . . . ."). The Third Circuit has taken a different approach -- although significantly, for our purposes, also a narrow one -- holding that the provision "only applies to suits challenging the government's selective enforcement of the immigration laws." DeSousa v. Reno, 190 F.3d 175, 182 (3d Cir. 1999); see Mirmehdi v. United States, 689 F.3d 975, 983 n.4 (9th Cir. 2012) (explaining that "'an alien unlawfully in this country has no constitutional right to assert [a claim of] selective enforcement' of immigration laws" (quoting AADC, 525 U.S. at 488)).

The district court concluded that Alvarez's complaint contained two kinds of allegations -- those that arose from the decision to initiate his removal proceedings, and others that arose from the execution of his removal order. First, it found that any challenge to ICE's decision to require Alvarez to attend removal proceedings -- rather than agreeing to a stipulated order -- fell squarely within the scope of § 1252(g). We agree with this determination. The challenge to ICE's decision, made by its counsel, Defendant Emery, essentially asks this Court to find that the agency should have chosen a different method of commencing proceedings. The district court was correct to find that § 1252(g) strips us of the power to entertain such a claim. By its plain terms, the provision bars us from questioning ICE's discretionary decisions to commence removal -- and thus necessarily

19

prevents us from considering whether the agency should have used a different statutory procedure to initiate the removal process.

Next, the district court addressed Alvarez's challenges to ICE's decision to take him into custody and to detain him during his removal proceedings -- concluding that they also were closely connected to the decision to commence proceedings, and thus were immune from our review. Again, the district court was correct.  Looking to the specific factual allegations in the complaint, Alvarez alleges, among other claims, that (1) ICE failed to honor the "best efforts" commitment in his plea bargain and reach a timely determination of his immigration status; [3] and (2) during the hearing in federal court on Alvarez's § 2255 motion to lift his detainer, Defendant Emery knowingly misrepresented that he was unaware of whether a Cuban national with Alvarez's background had ever been removed to a third country.  These allegations similarly arise from ICE's decision to

---

[3] In some instances, the complaint also appears to challenge the conduct of the Department of Justice attorneys who were involved in negotiating Alvarez's plea agreement for weapons charges.  Thus, for example, he alleges that their commitment to use their best efforts to timely resolve his immigration status was "a hollow promise" because "neither the Department of Justice nor ICE did anything to make a decision regarding [his] immigration status."  Notably, however, Alvarez did not name these attorneys as defendants, nor did he assert that they participated in the allegedly unlawful ICE detention on which he bases his constitutional claims.  The Supreme Court has made clear that to state a Bivens claim, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009).  Thus, to the extent Alvarez challenges conduct by the Department of Justice attorneys who negotiated his plea agreement, we reject his pleadings as being wholly insufficient to state a claim.

commence proceedings. Although the first allegation uses the term "best efforts" and references Alvarez's plea bargain, at its core it challenges ICE's decision to lodge a detainer against him. Accordingly, both allegations challenge the propriety of ICE's decision to detain Alvarez prior to his removal hearing.

As a panel of this Court explained in Gupta v. McGahey, "securing an alien while awaiting [his removal hearing] constitutes an action taken to commence proceedings." 709 F.3d 1062, 1065 (11th Cir.), suggestion for reh'g en banc denied, 737 F.3d 694 (2013), cert. denied, 134 S. Ct. 2840 (2014). In Gupta, a removable alien argued that federal agents "illegally procured an arrest warrant, that the agents illegally arrested him, and that the agents illegally detained him." Id. We found that § 1252(g) barred us from reaching the merits of these claims -- which we said arose from the decision to commence proceedings. Id. at 1065-66. Here, Alvarez similarly argues that he was detained by means of misrepresentations and disregard for the Department of Justice's commitment in his plea agreement. Because Alvarez challenges the methods that ICE used to detain him prior to his removal hearing, these claims are foreclosed by § 1252(g) and our decision in Gupta.

21

Finally, the district court concluded that all of ICE's actions taken after Alvarez was ordered removed on January 22, 2009, also fell within the scope of § 1252(g)'s jurisdictional bar because they arose from the decision to execute his removal order. The court observed that "ICE has the . . . authority to detain an alien who has been ordered removed if he is determined 'to be a risk to the community or unlikely to comply with the order of removal.'" See 8 U.S.C. § 1231(a)(6). It then found that all of Alvarez's challenges to ICE's post-removal actions constituted challenges to this discretionary determination. The court ultimately found that although Alvarez "dispute[d] that he posed any risk to the community, that determination is exactly the type of action that arises from ICE's discretionary authority to execute a removal order."

We part ways with the district court here. Alvarez claims that the defendants took various steps in order to prolong his detention after the statutory 90-day period that ICE was afforded to execute his removal, which began on January 22, 2009. First, on April 22, 2009, Defendant Skinner issued the "First Decision to Continue Detention" -- which allegedly falsely stated that Alvarez's removal would take place in the "reasonably foreseeable future" and that he would not be released in the meantime on the grounds that he was a flight risk and posed a danger to the community.

22

Second, on October 14, 2009, Defendant Munoz issued the "Second Decision to Continue Detention" which made the same alleged misstatements and added that Alvarez was eligible for Spanish citizenship. Moreover, Defendant Wall filed a motion in support of a continuance in Alvarez's habeas proceedings, despite allegedly knowing that Alvarez was not in fact eligible for Spanish citizenship. Finally, Defendant Gladish submitted an affidavit, which was attached to Wall's motion, stating that Alvarez would be removed to Spain in the reasonably foreseeable future because he was eligible for Spanish citizenship, despite allegedly knowing that this was untrue. These habeas actions also occurred months after the statutory removal period had lapsed -- indeed, the 90-day removal period ended on April 22, 2009 and Alvarez did not file his petition for a writ of habeas corpus until July 28, 2009.

As we see it, no matter how broadly we define the term "execute a removal order," we would still be compelled to find that these actions, if accurately portrayed in the complaint, do not "arise from" such a decision. Indeed, Alvarez alleged that no decision to execute his removal orders was ever reached. He repeatedly alleged that the named officials knew that he could not be removed -- to Cuba, Spain, or any other country and never intended to remove him.

23

Alvarez's complaint alleges, then, that each action taken by the defendants after the statutory 90-day period was motivated by the singular intent to prolong his detention, not to execute his removal. If, as Alvarez claims, the defendants knew that it would be impossible to execute his removal order at 90-days, at six months, or afterward -- when they issued the two Decisions to Continue Detention and opposed his habeas petition -- then these acts cannot be said to have arisen from a decision to remove him. Quite simply, a claim that arises from the decision to indefinitely detain an alien -- and thus, by definition, never to remove him -- cannot arise from the decision to execute removal.

Our interpretation is consonant with the Supreme Court's instructions to read § 1252(g) as a narrow provision. See AADC, 525 U.S. at 482; see also Humphries, 164 F.3d at 943 ("As a general matter, 'arising from' does seem to describe a nexus somewhat more tight than the also frequently used phrase 'related to.'"). It is also consistent with the dual purposes of the provision that the Supreme Court identified. American-Arab Anti-Discrimination Committee establishes that § 1252(g) is "designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations, providing that if they are reviewable at all, they at least will not be made the bases for separate rounds of judicial

24

intervention outside the streamlined process that Congress has designed." 525 U.S. at 485.  This means that we should apply it to preclude "[e]fforts to challenge the refusal to exercise [favorable] discretion on behalf of specific aliens," id. (quoting C. Gordon, S. Mailman, & S. Yale-Loehr, Immigration Law and Procedure § 72.03 [2][a]), as well as those claims that would lead to "the deconstruction, fragmentation, and hence prolongation of removal proceedings," id. at 487.

Alvarez's case presents neither situation.  Alvarez does not allege that ICE should have exercised its discretion and released him.  Rather, he claims that after the initial 90-day removal period, the agency had no statutory grounds on which to detain him because his removal was not reasonably foreseeable.  See Zadvydas v. Davis, 533 U.S. 678, 699-700 (2001) ("[I]f removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute.").  Moreover, there is no danger that our exercise of jurisdiction will lead to the "deconstruction" or "fragmentation" of removal proceedings -- Alvarez's removal has already been fully adjudicated, and ICE has already released him from custody.  Thus, we hold that § 1252(g) does not strip us of jurisdiction.

25

IV.

We come then to the central merits question -- whether we should expand the judicially crafted Bivens cause of action to cover these claims against Defendants Emery, Skinner, Munoz, Wall, and Gladish. We agree with the district court and hold that no Bivens remedy is available. We affirm on this basis, and thus do not decide whether any of its other rationales would be sufficient to support the dismissal.

In Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), the Supreme Court for the first time recognized an implied private action for damages against federal officers alleged to have violated a citizen's Fourth Amendment rights while acting in their official capacities. The Supreme Court subsequently held that its decision in Bivens also allows plaintiffs to bring claims for damages when federal officials engage in certain conduct that violates the Fifth and Eighth Amendments, finding that in these contexts a complete absence of alternative remedies required the recognition of an implied cause of action. Walden v. Centers for Disease Control & Prevention, 669 F.3d 1277, 1284 n.3 (11th Cir. 2012) (citing Carlson v. Green, 446 U.S. 14 (1980); Davis v. Passman, 442 U.S. 228 (1979)). Notably, however, the Court has not extended Bivens into a new context since 1980. Id.; Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 70 (2001) ("In 30 years of Bivens jurisprudence we have extended its

holding only twice, to provide an otherwise nonexistent cause of action against individual officers alleged to have acted unconstitutionally, or to provide a cause of action for a plaintiff who lacked any alternative remedy for harms caused by an individual officer's unconstitutional conduct." (emphases omitted)); De La Paz v. Coy, 786 F.3d 367, 372 (5th Cir. 2015) ("The Court has not created a new Bivens remedy in the last thirty-five years, although 'it has reversed more than a dozen appellate decisions that had created new actions for damages.'" (quoting Vance v. Rumsfeld, 701 F.3d 193, 198 (7th Cir. 2012) (en banc))).

In analyzing whether to recognize a Bivens remedy in a new context, we engage in a two-step inquiry. "In the first place," we ask "whether any alternative, existing process for protecting the constitutionally recognized interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." Minneci v. Pollard, 132 S. Ct. 617, 621 (2012) (alterations adopted) (quoting Wilkie v. Robbins, 551 U.S. 537, 550 (2007)). If we find that existing process is sufficiently protective, we do not recognize a Bivens remedy. The alternatives need not "provide complete relief for the plaintiff," Schweiker v. Chilicky, 487 U.S. 412, 423 (1988) (quoting Bush v. Lucas, 462 U.S. 367, 388 (1983)), and as long as Congress has established an "elaborate, comprehensive scheme" governing a particular type of claim, this Court will not allow a Bivens remedy to supplement that system, id. at 436 (quoting Bush, 462

27

U.S. at 385). As the Supreme Court has put it, "The question is not what remedy the court should provide for a wrong that would otherwise go unredressed. It is whether an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations, should be augmented by the creation of a new judicial remedy for the constitutional violation at issue." Bush, 462 U.S. at 388.

But even in the absence of an adequate alternative, "a Bivens remedy is a subject of judgment," Minneci, 132 S. Ct. at 621 (internal quotation marks and citations omitted), and we "must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counseling hesitation before authorizing a new kind of federal litigation," Bush, 462 U.S. at 378. The Supreme Court has "repeatedly said that a decision to create a private right of action is one better left to legislative judgment in the great majority of cases." Sosa v. Alvarez-Machain, 542 U.S. 692, 727 (2004). Accordingly, the federal courts have resisted extending the availability of Bivens remedies in new contexts on the basis of numerous special factors, including "military concerns, separation of powers, the comprehensiveness of available statutory schemes, national security concerns, and foreign policy considerations." Arar v. Ashcroft, 585 F.3d 559, 573 (2d Cir. 2009) (en banc) (citations omitted).

28

Although we have never explicitly considered whether to imply a Bivens remedy in the immigration context, two of our sister circuits have counseled against it, concluding both that the Immigration and Nationality Act provides an adequate alternative remedy and that, even if it didn't, special factors counsel in favor of hesitation.[4]  First, in Mirmehdi v. United States, the Ninth Circuit considered a set of facts similar to the ones we currently face.  689 F.3d 975 (9th Cir. 2011).  The plaintiffs were arrested for minor immigration violations and released on bond.  Id. at 979.  The following year, however, federal officials sought to have their bond revoked because their names appeared on a handwritten document that the officials claimed was a membership list recovered from the headquarters of a known terrorist group.  Id.  The plaintiffs were then detained pending the resolution of their removal proceedings for nearly four years.  Id.  They brought suit alleging that two federal agents knowingly lied about their involvement in the organization in order to induce the immigration judge to revoke

---

[4] The Second Circuit has also considered a related question -- namely whether a Bivens claim is available when a plaintiff alleges constitutional violations that occurred during extraordinary rendition.  Arar, 585 F.3d at 572.  However, the opinion focused almost exclusively on special factors counseling hesitation that are not implicated by Alvarez's claims -- such as the need to examine classified information, id. at 576, the impossibility of conducting proceedings in open court, id. at 576-77, the potential for relationships with foreign governments to come under scrutiny, id. at 578, and the possibility that recognizing a Bivens remedy would "make the government 'vulnerable to graymail,'" id. at 578 (quoting Tenet v. Doe, 544 U.S. 1, 11 (2005)).

29

their bond, and they asked the court to recognize a remedy under Bivens. Id. at 979-80.

The Ninth Circuit held that it would be inappropriate to imply a Bivens remedy in this context. Looking first to the availability of alternative remedies, it noted that "Congress has established a substantial, comprehensive, and intricate remedial scheme in the context of immigration," and that the availability of a writ of habeas corpus provides additional protection. Id. at 982 (quoting Arar, 585 F.3d at 572). The court next decided, in the alternative, that at least two special factors weighed against recognizing a Bivens remedy. First, "[t]he complexity and comprehensiveness of the existing remedial system," suggested that no judicial intervention was warranted. Id. Second, "immigration issues 'have the natural tendency to affect diplomacy, foreign policy, and the security of the nation,'" which counseled hesitation. Id. (quoting Arar, 585 F.3d at 574).

The Fifth Circuit recently reached the same conclusion in De La Paz v. Coy, 786 F.3d 367 (5th Cir. 2015), and held that Bivens does not extend to "claims arising from civil immigration apprehensions and detentions, other than those alleging unconstitutionally excessive force."[5] Id. at 375. In De La Paz, the court

---

[5] At first glance, De La Paz seems factually distinguishable from Mirmehdi -- and from Alvarez's allegations -- because it involved a Fourth Amendment challenge to decisions by Customs and Border Patrol agents to stop and detain illegal aliens near the border between the United States and Mexico. Id. at 370-71. However, the Fifth Circuit characterized the issue before it as "whether Bivens extends to claims arising from civil immigration apprehensions and detentions, other than those alleging unconstitutionally excessive force," id. at 375, and explicitly

undertook the same two-step inquiry, first determining that judicial recognition of a new remedy was unnecessary because the existing "federal governance of immigration and alien status is extensive and complex." Id. (alteration adopted) (quoting Arizona v. United States, 132 S. Ct. 2492, 2499 (2012)). The court then found that, even if the INA did not provide an adequate remedy, numerous "special factors unique to the immigration context" counseled against an extension. Id. at 378. Among other things, the court found that federal agents may be deterred "from vigorous enforcement and investigation of illegal immigration," id. at 379, and that extending Bivens suits to the immigration context could lead to a substantial influx in litigation, id. at 379-80. Moreover, "immigration policy and enforcement implicate serious separation of powers concerns." Id. at 379.

We too hold that a plaintiff cannot recover damages under Bivens for constitutional violations that caused him to endure a prolonged immigration detention.[6] The Immigration and Nationality Act is "an elaborate remedial system

---

rejected the argument that Mirmehdi was distinguishable. See id. at 375 n.7.

[6] We need not, and do not, decide whether a Bivens remedy would be available in cases of physical abuse, see De La Paz, 786 F.3d at 374, or punitive confinement conditions, Turkmen v. Hasty, 789 F.3d 218, 235-37 (2d Cir. 2015). Alvarez does not allege that he was mistreated during his detention, and thus we have no occasion to grapple with the unique issues that these types of allegations could present. See Gupta, 737 F.3d at 696 (Wilson, J., concurring in denial of rehearing) ("Should the scenario come along where an alien is . . . physically beaten during the course of what ought to be a peaceful arrest arising from a decision to commence removal proceedings, judicial review would likely be necessary . . . ."); see also Turkmen, 789 F.3d at 235-36 (noting that "[b]oth the Supreme Court and [the Second] Circuit have recognized a

that has been constructed step by step, with careful attention to conflicting policy considerations." Bush, 462 U.S. at 388. Indeed, Congress has provided for a host of review procedures tailored to the differently situated groups of aliens that may be present in the United States. The Act sets out numerous avenues for aliens to obtain review of ICE decisions by an immigration judge or federal court, as well as opportunities for aliens to seek discretionary relief. See 8 U.S.C. § 1225(a)(2), (b)(1)(A)(ii), (b)(1)(B)(iii)(III) (providing that aliens treated as applicants for admission and stowaways may apply for asylum and are entitled to "prompt review by an immigration judge" if they are found ineligible); id. § 1228(c) (providing procedures for an alien convicted of an aggravated felony to be immediately ordered removed by a federal district court and granting both parties the right to appeal the court's decision); id. § 1229a(a)(1) (providing that an immigration judge shall decide the inadmissibility or deportability of an alien); id. § 1229a(c)(7) (providing that an alien may file one motion to reopen his removal proceedings on the basis of newly discovered facts); id. § 1229b(a)-(b) (giving the Attorney General discretion to cancel the removal of aliens, resident aliens, and victims of violence who meet enumerated criteria); 8 C.F.R. § 241.4(k)(2)(iii) (requiring that, when an alien is detained for longer than 90 days, he be permitted to request his

---

Bivens remedy for constitutional challenges to [punitive] conditions of confinement" and extending the remedy to the immigration detention context).

32

release every three months and that he receive review from the Headquarters Post-Order Detention Unit).

Additionally, the Supreme Court has made it abundantly clear that a detained alien can seek a petition for a writ of habeas corpus to challenge his detention in the event that the statute's review procedures are insufficiently protective. See Zadvydas, 533 U.S. at 688 ("We conclude that § 2241 habeas corpus proceedings remain available as a forum for statutory and constitutional challenges to post-removal-period detention."); accord St. Cyr, 533 U.S. at 314. The dissent discounts the significance of possible habeas relief. But we can discern no reason to exclude the option of seeking habeas relief from our consideration. Surely Congress was aware of the habeas rules it had crafted in 28 U.S.C. § 2241 when it repeatedly legislated in the area of immigration law. Moreover, we have previously held that the availability of habeas relief when paired with a detailed regulatory scheme constitutes a special factor counseling against recognizing a new Bivens cause of action. Rauschenberg v. Williamson, 785 F.2d 985, 987-88 (11th Cir. 1986). In fact, habeas corpus provides a litigant like Alvarez with the most speedy, direct, and powerful remedy from wrongful detention. See Ex parte Yerger, 75 U.S. 85, 95 (1868) ("The great writ of habeas corpus has been for centuries esteemed the best and only sufficient defence of personal freedom."); accord Boumediene v. Bush, 553 U.S. 723, 739 (2008) ("The

33

Framers viewed freedom from unlawful restraint as a fundamental precept of liberty, and they understood the writ of habeas corpus as a vital instrument to secure that freedom.").  In sharp contrast, monetary compensation would afford, at best, an incomplete, secondary, and substantially delayed remedy for a detention based on false claims made by a government agent.

Analysis of the statutory scheme also confirms the conclusion that the congressional decision not to provide a private action for damages was deliberate. See De La Paz, 786 F.3d at 377-78; Mirmehdi 689 F.3d at 982.  Indeed, Congress has amended the Immigration and Nationality Act on no less than seven occasions. See, e.g., REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 302 (2005); Illegal Immigration Reform and Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (1996); Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996); Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (1990); Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359 (1986); Immigration and Nationality Act Amendments of 1976, Pub. L. No. 94-571, 90 Stat. 2703 (1976); Immigration and Nationality Act Amendments of 1965, Pub. L. No. 89-236, 79 Stat. 911 (1965).  In light of the frequent attention that the legislature has given to the complex scheme governing removal and its review procedures over many years, we are satisfied that Congress has weighed the policy considerations in favor of and against providing damages.

34

See Schweiker, 487 U.S. at 425-26 (explaining that because "[c]ongressional attention . . . has . . . been frequent and intense" and "[a]t each step, Congress chose specific forms and levels of protection for the rights of persons affected" it was clear that the failure to provide for damages was intentional).

Thus, the complexity of the Immigration and Nationality Act, and Congress's frequent amendments to it, suggest that no Bivens remedy is warranted. We also note that Alvarez has not "alleged that he was actively prevented from seeking any meaningful review and relief through the INA processes." See Arar, 585 F.3d at 573 (emphasis added). In fact, Alvarez availed himself of the Act's review mechanisms many different times during his detention. He first sought relief under 28 U.S.C. § 2255, arguing that the magistrate judge should lift his ICE detainer. Next, he appeared before an immigration judge for a hearing -- where he had the opportunity to apply for relief or protection from removal, or to contest his removability. See 8 U.S.C. § 1229a(a)(1). After he was ordered removed, he sought discretionary relief from Defendant Felicia Skinner, and asked her to expedite review of his case during the statutory removal period. He also received two custody determinations by ICE -- though in each instance the agency found sufficient grounds to continue detaining him, as Skinner and Munoz explained in their Decisions to Continue Detention. Finally, Alvarez filed a petition for a writ of habeas corpus in the United States District Court for the Middle District of

35

Georgia, pursuant to 28 U.S.C § 2241, alleging that his detention was unconstitutional.  In short, he is in no position to argue that the elaborate scheme that Congress designed afforded him no opportunity for a meaningful remedy.  See Schweiker, 487 U.S. at 425 ("Congress . . . has not failed to provide meaningful safeguards or remedies for the rights of persons situated as respondents were.").

Moreover, even if we were to conclude that no sufficient alternative remedy exists, we would still find that numerous special factors counsel hesitation in this context.  For starters, the breadth and detail of the Immigration and Nationality Act itself counsels in favor of hesitation.  Mirmehdi, 689 F.3d at 982.  As the Supreme Court has explicitly cautioned, "[w]hen the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration," this constitutes a "special factor[] counseling hesitation." Schweiker, 487 U.S. at 423.  Another special factor is the importance of demonstrating due respect for the Constitution's separation of powers.  As the Fifth Circuit explained, "[t]he Constitution gives Congress the power to 'establish a uniform Rule of Naturalization,'" De La Paz, 786 F.3d at 379 (quoting U.S. Const., art. I, § 8, cl. 4), and the Executive possesses "inherent power as sovereign to control and conduct relations with foreign nations," id. (quoting Arizona, 132 S. Ct. at 2498); see also Arar, 585 F.3d at 575 ("The Supreme Court has expressly

36

counseled that matters touching upon foreign policy and national security fall within 'an area of executive action in which courts have long been <u>hesitant</u> to intrude' absent congressional authorization." (quoting <u>Lincoln v. Vigil</u>, 508 U.S. 182, 192 (1993))). This "gives the political branches of the federal government 'broad, undoubted power over the subject of immigration.'" <u>De La Paz</u>, 786 F.3d at 379 (quoting <u>Arizona</u>, 132 S. Ct. at 2498). These branches are generally better "situated to consider sensitive foreign policy issues" that immigration cases may implicate, and involvement of the courts into their domain can in some instances "undermine the Government's ability to speak with one voice in this area." <u>Munaf v. Green</u>, 553 U.S. 674, 702 (2008); <u>see also</u> <u>Mirmehdi</u> 689 F.3d at 982-83 (noting that "immigration issues 'have the natural tendency to affect diplomacy, foreign policy, and the security of the nation,'" and may involve "the disclosure of foreign-policy objectives" (quoting <u>Arar</u>, 585 F.3d at 574, and <u>AADC</u>, 525 U.S. at 490)). In short, "[l]ack of institutional competence as well as a lack of constitutional authority counsel . . . hesitation by the judiciary in fostering litigation of this sort." <u>De La Paz</u>, 786 F.3d at 379.

Finally, Alvarez's allegations implicate one additional special factor counseling hesitation -- namely the claim he asks us to recognize would be doctrinally novel and difficult to administer. <u>See</u> <u>Hernandez v. United States</u>, 757 F.3d 249, 275 (5th Cir.), <u>reh'g en banc granted</u>, 771 F.3d 818 (2014), <u>adhered to in</u>

37

part on reh'g en banc, 785 F.3d 117 (2015) ("Another species of special factor is the workability of the cause of action."). Alvarez's claims do not involve "questions of precisely Bivens-like domestic law enforcement and nothing more." Id. at 276. Rather, Alvarez asks us to examine ICE's motivations for continuing not only his own detention, but that of every other alien who may be detained past the statutory 90-day period. The agency's discretion to abandon removal proceedings for humanitarian or efficiency reasons, see AADC, 525 U.S. at 483-84, would make it particularly difficult for us to undertake this kind of inquiry. As a result, to decide each claim, we would need to consider, among other things, the likelihood of effecting removal, "the [removal's] general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan," and weigh these against the alien's allegations of deceit. Id. at 490 (quoting Wayte v. United States, 470 U.S. 598, 607 (1985)). In other words, the claim Alvarez asks us to recognize is not generally susceptible to the kind of analysis the courts are competent to undertake. See id.

Moreover, it is difficult to conceive that any alien would forgo making such an argument in our Court if we were to recognize the availability of a Bivens remedy for this type of conduct. The lack of a clearly defined standard by which to judge such claims, and the nature of the claim as based primarily on the credibility

38

of each party, would likely lead to widespread litigation.  And we cannot ignore that this volume of litigation could chill ICE officials from engaging in robust enforcement of this country's immigration laws.  As the Fifth Circuit explained, "Faced with a threat to his checkbook from suits based on evolving and uncertain law, the officer may too readily shirk his duty." De La Paz, 786 F.3d at 379; see also AADC, 525 U.S. at 490 ("'Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy.' . . . These concerns are greatly magnified in the deportation context." (quoting Wayte, 470 U.S. at 607)).  While we acknowledge that ICE officials may act wrongly in detaining certain aliens -- and may even in some instances violate the Constitution -- we cannot agree with Alvarez that recognizing a Bivens remedy would be a prudent way to address this possibility.  See Wilkie, 551 U.S. at 561 ("The point here is not to deny that Government employees sometimes overreach, for of course they do, and they may have done so here if all the allegations are true. The point is the reasonable fear that a general Bivens cure would be worse than the disease.").

Alvarez argues nevertheless that the Immigration and Nationality Act does not serve as an adequate existing remedy because it does not provide him with an

39

avenue to seek damages. However, the Supreme Court has made it clear that Congress's failure to provide monetary relief is not dispositive. See Malesko, 534 U.S. at 69 ("So long as the plaintiff had an avenue for some redress, bedrock principles of separation of powers foreclose[] judicial imposition of a new substantive liability."); Schweiker, 487 U.S. at 421-22 ("The absence of statutory relief for a constitutional violation, for example, does not by any means necessarily imply that courts should award money damages against the officers responsible for the violation."); cf. Minneci, 132 S. Ct. at 625 ("[S]tate tort law may sometimes prove less generous than would a Bivens action . . . . But we cannot find in this fact sufficient basis to determine state law inadequate.").

This Court, and our sister circuits, have also repeatedly said that we will defer to Congress's decision not to award damages for a particular violation, particularly in the face of a carefully crafted remedial scheme. See Lee, 145 F.3d at 1276-77 (declining to find a Bivens remedy because "there was no inadvertence by Congress in omitting a damages remedy" in a statutory scheme); Miller v. U.S. Dep't of Agr. Farm Servs. Agency, 143 F.3d 1413, 1415 (11th Cir. 1998) ("Congress is in a better position than the courts to weigh the competing policy imperatives involved in the creation of remedies . . . ."); De La Paz, 786 F.3d at 377 ("[The plaintiffs] argue that the INA fails adequately to protect their Fourth Amendment interests because it does not provide a damages remedy against

40

individual agents.  This is a misreading of the case law.  The INA need not provide an exact equivalent to Bivens."); Engel v. Buchan, 710 F.3d 698, 704 (7th Cir. 2013) ("[T]he Court has explained that the existence of a comprehensive, alternative remedial scheme may preclude a Bivens remedy even where the alternative relief is imperfect compared to Bivens and Congress has not explicitly declared it to be a substitute."); Mirmehdi, 689 F.3d at 982 ("Indeed, so long as Congress' failure to provide money damages has not been inadvertent, courts should defer to its judgment." (internal quotation marks omitted and alterations adopted)); Arar, 585 F.3d at 573 ("In light of the complexity of the remedial scheme Congress has created (and frequently amended), we would ordinarily draw a strong inference that Congress intended the judiciary to stay its hand and refrain from creating a Bivens action in this context.").

Alvarez also suggests that our decision in Abella v. Rubino, 63 F.3d 1063 (11th Cir. 1995) (per curiam), counsels in favor of recognizing a Bivens remedy in this context.  We disagree.  In Abella, the plaintiff, a federal prisoner, filed a Bivens action against "two federal district judges, an assistant U.S. Attorney, U.S. Customs and DEA officials, U.S. Marshals, three federal court reporters, a judicial law clerk, a secretary, and several of [his] co-defendants and their respective attorneys," alleging that these defendants "knowingly and willfully conspired to convict him falsely by fabricating testimony and other evidence against him."  Id.

41

at 1064.  The district court dismissed the claims, finding that they were barred by the Supreme Court's decision in Heck v. Humphrey.  Id. at 1065.[7]  We affirmed the district court's dismissal on this ground and noted, in passing, that the plaintiff was entitled to "bring his Bivens damages claims in the future should he meet the requirements of Heck."  Id.  With this language, we did not opine on whether we would find a Bivens remedy to be available if Abella ever became eligible to challenge his conviction with a civil suit, let alone suggest that Bivens should be applied in the immigration context.  We merely reiterated that our affirmance of the district court's decision was based only on the plaintiff's failure to satisfy Heck's requirements.  Abella in no way suggests that we should recognize an expanded Bivens remedy in this context.

## V.

Thus, we hold that the district court erroneously concluded that it had no jurisdiction to entertain the merits of Alvarez's claim under 8 U.S.C. § 1252(g).  However, we fully agree that no Bivens remedy is available when a plaintiff claims that he was unconstitutionally detained after being ordered removed by an immigration judge.  Accordingly, we AFFIRM.

_____

[7] Heck and its progeny preclude 42 U.S.C. § 1983 and Bivens actions "to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid," unless the plaintiff shows that "the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus."  Abella, 63 F.3d at 1065 (quoting Heck, 512 U.S. at 486-87).

JILL PRYOR, Circuit Judge, concurring in part and dissenting in part:

I join fully in the majority's thorough analysis in Part III addressing subject-matter jurisdiction. But I dissent from Part IV of the majority opinion holding that plaintiff Santiago Alvarez has no remedy under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). More specifically, I dissent from the majority's opinion affirming the district court's dismissal of Alvarez's claim against defendant Juan Munoz, although I concur with the majority's decision to affirm the dismissal of Alvarez's claims against defendants Robert Emery, Michael Gladish, Felicia Skinner, and Sheetul Wall.

In this case, Supreme Court precedent, a federal statute, and its accompanying regulations required U.S. Immigration and Customs Enforcement ("ICE") to release Alvarez approximately 180 days after his removal order was final if there was no significant likelihood that he would be removed in the reasonably foreseeable future. The majority acknowledges Alvarez's allegation that Munoz, the ICE official who reviewed Alvarez's detention at the 180-day mark, "knew that [Alvarez] could not be removed – to Cuba, Spain, or any other country and never intended to remove him." Maj. Op. at 23. As the majority recognizes, Alvarez alleged that Munoz improperly continued Alvarez's detention knowing there were "no statutory grounds on which to detain him." *Id.* at 25. Nonetheless, the majority concludes that Alvarez has no *Bivens* remedy because he

43

failed to "allege[] that he was actively prevented from seeking any meaningful review and relief" and thus was "in no position to argue that the elaborate scheme that Congress designed afforded him no opportunity for a meaningful remedy." *Id.* at 35-36 (internal quotation marks omitted).  I am unable to reconcile the majority's conclusion that Alvarez was afforded meaningful review with his plausibly alleged claim that Munoz performed a sham review and continued to detain him, knowing that the law required his release.  Accordingly, I disagree with the majority that Alvarez can have no *Bivens* remedy for his due process claim against Munoz.[1]

The district court dismissed Alvarez's claims on the alternative grounds that (1) the claims were barred by *Heck v. Humphrey*, 512 U.S. 477 (1994); (2) the defendants were entitled to qualified immunity; and (3) the claims were barred by

---

[1] The majority properly affirms the dismissal of Alvarez's claims against Emery, Gladish, Skinner, and Wall. The claims against Emery arose out of actions that he took before Alvarez was subject to a final removal order.  I agree with the majority that we lack jurisdiction under 8 U.S.C. § 1252(g) to consider these claims.  *See* Maj. Op. at 19-21.

Alvarez's claims against Skinner arose out of her refusal to expedite his 90-day review and her decision to continue his detention at the 90-day review.  I agree with the majority that no *Bivens* remedy is available for Alvarez's claims against Skinner because he failed to allege a plausible factual basis for his allegation that Skinner intentionally denied him meaningful review.  *See infra* note 15.

Alvarez alleged that Gladish and Wall knowingly made false statements—in a motion for extension of time to respond to Alvarez's habeas petition and in a supporting declaration—for the purpose of delaying the habeas court's review of Alvarez's challenge to his detention.  These claims were properly dismissed because Alvarez failed to allege a factual basis for his allegation that Gladish and Wall knew that their statements that he could not be removed to Spain in the reasonably foreseeable future were false.  *See infra* note 19.

the statute of limitations.  Because I believe that the district court erred in each of these determinations, I would vacate the district court's order and remand so that Alvarez's due process claim against Munoz could proceed.[2]

## I.    Legal Background

As a starting point, it is important to understand the limits the law imposes on the Attorney General's authority to continue to detain aliens after their removal orders are final.  Although the Attorney General may detain certain aliens for a reasonable time after a final order of removal, the Executive Branch must periodically review its decision to continue an alien's detention.

### A.    Statutory Authority

"[W]hen an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days."[3]  8 U.S.C. § 1231(a)(1)(A).  Until aliens are removed, the Attorney General must hold them in custody during this 90-day period.  *Id.* § 1231(a)(2).  Recognizing that the Attorney General will be unable to remove every alien within the 90-day period, Congress has allowed (but does not require) the Attorney General to detain certain

---

[2] Although the majority does not discuss the district court's alternative holdings, I address them to show why none of the alternative grounds supports the district court's dismissal of Alvarez's claim against Munoz.

[3] There is no dispute that the 90-day removal period began to run when Alvarez's removal order became administratively final on January 22, 2009.  *See* 8 U.S.C. § 1231(a)(1)(B).

categories of aliens "beyond the removal period." [4]  *Id.* § 1231(a)(6).   But in

*Zadvydas v. Davis*, the United States Supreme Court read into this statute a

requirement that the Attorney General may detain these aliens only for a

"reasonable time" after their removal orders are final.  533 U.S. 678, 682 (2001)

("[W]e construe the statute to contain an implicit 'reasonable time' limitation

. . . .").

In *Zadvydas*, two aliens, who were detained for years after their final orders

of removal because the Attorney General could find no country that would accept

them, petitioned for habeas corpus relief.  *Id.* at 684-86.  The government argued

that § 1231(a)(6) authorized the Attorney General to detain indefinitely aliens

subject to final orders of removal.  *Id.* at 689.  The Supreme Court rejected this

interpretation, explaining that indefinite detention would "raise a serious

constitutional problem" because it would violate the aliens' Fifth Amendment

rights under the Due Process Clause.  *Id.* at 690.  Applying the canon of

constitutional avoidance, the Court construed § 1231(a)(6) to include an implicit

requirement that the Attorney General could detain an alien only for the "period

---

[4] Aliens who may be detained beyond the 90-day removal period include those who: (1) are removable because they committed certain criminal offenses, (2) engaged in criminal activities that endangered public safety or national security, or (3) pose a risk to the community or are unlikely to comply with a removal order.  *See* 8 U.S.C. § 1231(a)(6) (identifying aliens who may be detained beyond 90-day removal period to include aliens who are removable under § 1227(a)(2)).  There is no question that the Attorney General was authorized to detain Alvarez beyond the 90-day removal period because he was removable based on his conviction of an aggravated felony and an offense related to unlawfully possessing firearms. *See id.* § 1227(a)(2)(A)(iii), (a)(2)(C).

46

reasonably necessary to secure removal." *Id.* at 699. The Court recognized two independent factors that cabin the period reasonably necessary to secure an alien's removal. First, when an alien's "removal is no longer reasonably foreseeable," the detention is "unreasonable and no longer authorized by statute." *Id.* at 699-700. Second, even if removal is reasonably foreseeable, the Attorney General may lack authority to detain an alien who poses no risk of committing further crimes. *See id.* at 700 ("And if removal is reasonably foreseeable, the habeas court should consider the risk of the alien's committing further crimes as a factor potentially justifying confinement within that reasonable removal period.").

The Supreme Court then provided practical guidance about the length of time the Attorney General could detain an alien after his removal order becomes final. Because the Executive Branch has primary responsibility for and expertise in foreign policy matters, the Supreme Court recognized that it must give "expert agencies decisionmaking leeway" and thus must "recognize some presumptively reasonable period of detention." *Id.* at 700-01. The Court therefore held that an alien's detention for six months (approximately 180 days) after a final order of removal is "presumptively reasonable" under § 1231(a)(6). *Id.* at 701. But after the expiration of this six-month period, the Attorney General has no power to detain an alien for whom "there is no significant likelihood of removal in the

reasonably foreseeable future."[5]  *Id.*; *accord Akinwale v. Ashcroft*, 287 F.3d 1050, 1051-52 (11th Cir. 2002).  Importantly, "as the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely would have to shrink."  *Zadvydas*, 533 U.S. at 701.

## B.    Regulatory Authority

Consistent with *Zadvydas*, regulations now require ICE officials periodically to review the decision to continue to detain an alien subject to a final order of removal.[6]  As I explain below, ICE officials must review the decision to detain an alien 90 days and again approximately 180 days after the alien's removal order is final, as well as at least yearly thereafter.  Importantly, ICE must release an alien after the 180-day review if there is no significant likelihood that she will be removed in the reasonably foreseeable future. But an alien no right to appeal a decision, upon review, to continue her detention.

### 1. 90-Day Review

---

[5] When it releases an alien subject to a final order of removal, the government may impose appropriate conditions of supervised release.  An alien who violates these conditions may be taken back into custody.  *Zadvydas*, 533 U.S. at 700.

[6] After *Zadvydas*, the regulations were substantially revised to "add[] new provisions to govern determinations . . . as to whether there is a significant likelihood that an alien will be removed from the United States in the reasonably foreseeable future."  Continued Detention of Aliens Subject to Final Orders of Removal, 66 Fed. Reg. 56967, 56967 (Nov. 14, 2001); *see id.* at 56968 ("In light of the Supreme Court's decision in *Zadvydas*, this rule revises the Department's regulations by adding a new 8 CFR 241.13, governing certain aspects of the custody determination of a detained alien after the expiration of the removal period. Specifically, the rule provides a process for [ICE] to make a determination as to whether there is a significant likelihood that the alien will be removed in the reasonably foreseeable future.").

When ICE is unable to remove an alien within 90 days of the removal order becoming final, it must review the alien's detention before the end of that 90-day period (the "90-day review"). 8 C.F.R. § 241.4(k)(1)(i). After reviewing the alien's records, a local ICE official may decide (but is not required) to release an alien whose "release will not pose a danger to the community or to the safety of other persons or to property or a significant risk of flight." *Id.* § 241.4(d), (h)(1), (k)(1). An ICE official may exercise her discretion to release an alien at the 90-day review stage only if she concludes that:

(1) Travel documents for the alien are not available or, in the opinion of the Service, immediate removal, while proper, is otherwise not practicable or not in the public interest;

(2) The detainee is presently a non-violent person;

(3) The detainee is likely to remain nonviolent if released;

(4) The detainee is not likely to pose a threat to the community following release;

(5) The detainee is not likely to violate the conditions of release; and

(6) The detainee does not pose a significant flight risk if released.

*Id.* § 241.4(e); *see id.* § 241.4(h)(3).[7]

---

[7] In applying these factors, an ICE official considers: (1) "disciplinary infractions or incident reports received" while the alien was incarcerated or in custody; (2) the alien's "criminal conduct and criminal convictions, including consideration of the nature and severity of the alien's convictions, sentences imposed and time actually served, probation and criminal parole history, evidence of recidivism, and other criminal history"; (3) "[a]ny available psychiatric and psychological reports"; (4) "[e]vidence of rehabilitation including institutional progress relating to participation in work, educational, and vocational programs, where available"; (5) "[f]avorable

An alien must receive written notice before the 90-day review occurs. *Id.*

§ 241.4(h)(2). She may submit written information supporting her release, which

the ICE official must review, and she has the right to receive assistance in

preparing her response. *Id.* § 241.4(h)(1), (2). The ICE official must provide the

alien with a written copy of the decision. *Id.* § 241.4(h)(4). If the ICE official

decides to continue the alien's detention, the decision must "set forth the reasons

for the continued detention." *Id.* § 241.4(d). The alien has no right to appeal a

decision to continue detention at the 90-day review. *Id.*

### 2. 180-Day Review

If ICE continues to detain an alien after the 90-day review, ICE's

Headquarters Post-Order Detention Unit (the "HQPDU") must review the alien's

detention approximately 180 days after the removal order becomes final (the "180-

day review").[8] *Id.* § 241.4(k)(2)(ii). The government concedes that, as part of the

---

factors, including ties to the United States such as the number of close relatives residing here lawfully"; (6) "[p]rior immigration violations"; (7) "[t]he likelihood that the alien is a significant flight risk"; and (8) "other information that is probative of whether the alien is likely to" adjust to life in a community, engage in future violence or criminal activity, pose a danger to persons or property, or violate the conditions of his release pending removal. 8 C.F.R. § 241.4(f), (h)(3).

[8] As noted above, Alvarez's removal order became final on January 22, 2009. On April 22, 2009, exactly 90 days later, Skinner issued her decision to continue his detention. On October 14, 2009, 265 days after the removal order was final, Munoz issued his decision to continue detention. Although it appears that Munoz completed the 180-day review three months late, the regulations provide some leeway, permitting the 180-day review to be completed within 180 days of the final order of removal "or as soon thereafter as practicable." 8 C.F.R. § 241.4(k)(2)(ii).

180-day review, the HQPDU must consider whether the alien will be removed in the reasonably foreseeable future.  If, at the 180-day review, the HQPDU determines "there is no significant likelihood that the alien will be removed in the reasonably foreseeable future," then the alien must be released from custody "under appropriate conditions of supervision."[9]  *Id.* § 241.13(c); *see* § 241.4(i)(7). In deciding whether there is a significant likelihood of removal, the HQPDU must consider

> all the facts of the case including . . . the history of the alien's efforts to comply with the order of removal, the history of the Service's efforts to remove aliens to the country in question or to third countries . . . , the reasonably foreseeable results of those efforts, and the views of the Department of State regarding the prospects for removal of aliens to the country or countries in question.

*Id.* § 241.13(f).[10]

---

[9] Under the regulations, an alien may submit a written request that the HQPDU review whether there is a significant likelihood of removal in the reasonably foreseeable future "any time after the removal order becomes final."  8 C.F.R. § 241.13(c), (d)(3).  But the HQPDU may postpone consideration of the request until the 90-day removal period expires.  *Id.* § 241.13(d)(3).  Moreover, the HQPDU "has no obligation to release an alien" until six months after the alien's removal order is final.  *Id.* § 241.13(b)(2)(ii).  Thus, the 180-day review is the first point at which an alien must be released if there is no significant likelihood of removal in the reasonably foreseeable future.

[10] Even when there is no significant likelihood of removal in the reasonably foreseeable future, ICE may continue to detain an alien if "special circumstances" warrant continued detention.  8 C.F.R. § 241.14.  Special circumstances exist when:  (1) the alien has a highly contagious disease that poses a threat to public safety; (2) the alien's release is likely to have serious, adverse foreign policy consequences; (3) the alien's release poses a significant threat to national security or a significant risk of terrorism; or (4) the alien is "specially dangerous."  *Id.* § 241.14(b)-(d), (f).  There is no contention that special circumstances were present in this case.

51

Additionally, at the 180-day review, the HQPDU has discretion (but is not required) to release an alien if the "release will not pose a danger to the community or to the safety of other persons or to property or a significant risk of flight." *Id.* § 241.4(d)(1). When deciding whether to exercise this discretion, the HQPDU must make the same findings that are required to release an alien at the 90-day review. *See id.* § 241.4(e)-(f).

The regulations guarantee an alien certain procedural protections in connection with the 180-day review. The HQPDU must notify the alien before performing the 180-day review. *Id.* § 241.4(k)(2)(ii). If the HQPDU is going to continue detaining the alien, it must interview the alien in person. *Id.* § 241.4(i)(3)(i). The alien must have an opportunity to submit written information to support her release and may receive assistance from a person of her choice. *Id.* § 241.4(i)(3)(ii). The HQPDU must provide the alien with a written copy of the decision. *Id.* § 241.4(d). If the HQPDU decides to continue the alien's detention, the decision must "set forth the reasons for the continued detention." *Id.* An alien has no right to appeal the HQPDU's decision to continue her detention. *Id.*

## II.    Analysis

### A. *Bivens* Remedy

I now turn to the central issue before us: whether Alvarez has a *Bivens* remedy for his claim that Munoz violated his Fifth Amendment right to due

52

process[11] by deciding at the 180-day review to continue Alvarez's detention despite knowing there was no significant likelihood he would be removed in the reasonably foreseeable future.  I disagree with the majority's broad, categorical holding that "a plaintiff cannot recover damages under *Bivens* for constitutional violations that caused him to endure a prolonged immigration detention."  Maj Op. at 31.  Instead I would recognize a *Bivens* remedy in this particular case, limited to Alvarez's claim against Munoz, because Alvarez has plausibly alleged that Munoz intentionally denied him meaningful administrative review when, despite knowing that Alvarez was required to be released, Munoz continued his detention.

In *Bivens*, the Supreme Court recognized that an individual had an implied private action for damages against federal officers who allegedly performed an illegal search of his home and arrested him without probable cause in violation of his Fourth Amendment rights.  *Bivens*, 403 U.S. at 389-90.  It cannot be denied that the Supreme Court has declined to recognize a *Bivens* remedy in a "new context" in more than thirty-five years.[12]  *Corr. Servs. Corp. v. Malesko*, 534 U.S.

---

[11] The Fifth Amendment, of course, guarantees due process.  *See* U.S. Const. amend V ("No person shall . . . be deprived of . . . liberty . . . without due process of law . . . .").  Aliens like Alvarez are entitled to due process protections.  *See Zadvydas*, 533 U.S. at 693 ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."); *Reno v. Flores*, 507 U.S. 292, 306 (1993) ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings.").

[12] I agree with the majority that here Alvarez asks us to recognize a *Bivens* remedy in a new context.

53

61, 67-68 (2001).  Nonetheless, "the Court has so far adhered to *Bivens'* core holding:  Absent congressional command or special factors counseling hesitation, 'victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right.'"  *Wilkie v. Robbins*, 551 U.S. 537, 576 (2007) (quoting *Carlson v. Green*, 446 U.S. 14, 18 (1980)).  As the majority recognizes, the Supreme Court continues to decide on a case-by-case basis whether a *Bivens* remedy is available in a new context by considering whether (1) there is an "alternative, existing process for protecting the [constitutionally recognized] interest" that "amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy," and (2) "special factors counsel[] hesitation before authorizing a new kind of federal litigation."  *Minneci v. Pollard*, 132 S. Ct. 617, 621 (2012) (first alteration in original and internal quotation marks omitted).

Carefully applying this case-by-case approach, our Court has both explicitly and implicitly recognized *Bivens* remedies in new contexts.  *See, e.g., Muhammad v. Williams-Hubble*, 380 F. App'x 925, 926-27 (11th Cir. 2010) (unpublished) (recognizing that *Bivens* remedy was available for inmate's claim alleging that because he was Muslim, prison officials refused to accept his high school diploma, which would have entitled him to a higher pay grade for work performed while in

54

custody); *Magluta v. Samples*, 375 F.3d 1269, 1284 (11th Cir. 2004) (reversing dismissal of pretrial detainee's *Bivens* claim alleging that Bureau of Prison officials violated his procedural due process rights under the Fifth Amendment when they placed him in administrative detention yet denied him review guaranteed by regulations); *Uboh v. Reno*, 141 F.3d 1000, 1002-03 (11th Cir. 1998) (recognizing that a Fourth Amendment claim for malicious prosecution "constitute[s] a cognizable *Bivens* claim" (internal quotation marks omitted)).[13]

### 1. Alternative Existing Processes

We begin by considering whether there were alternative existing processes to review Alvarez's detention such that the courts should refrain from extending a damages remedy. *See Minneci*, 132 S. Ct. at 621. This inquiry requires us to consider whether Congress has explicitly or implicitly indicated "that the Court's

---

[13] Other circuits also have recognized *Bivens* remedies in new contexts, including in claims arising out of immigration detention. *See Turkmen v. Hasty*, 789 F.3d 218, 237 (2d Cir.) (extending a *Bivens* remedy to a claim alleging punitive conditions of confinement in the immigration detention context), *reh'g en banc denied*, 808 F.3d 197 (2d Cir. 2015); *Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 625 (5th Cir. 2006) (permitting alien to seek a *Bivens* remedy for Fourth Amendment claim against border patrol agents for unlawful arrest and excessive use of force); *see also Engel v. Buchan*, 710 F.3d 698, 699 (7th Cir. 2013) (recognizing a *Bivens* remedy for alleged violations of *Brady v. Maryland*, 373 U.S. 83 (1963)); *Bistrian v. Levi*, 696 F.3d 352, 376 n.9 (3d Cir. 2012) ("[A] federal cause of action for damages may be implied directly from the [F]irst [A]mendment." (second and third alterations in original and internal quotation marks omitted)); *Robbins v. Wilkie*, 300 F.3d 1208, 1210, 1212 (10th Cir. 2002) (extending *Bivens* remedy to ranch owner alleging that federal employees violated his constitutional rights by trying to force him to grant an easement to federal agency); *Krueger v. Lyng*, 927 F.2d 1050, 1057 (8th Cir. 1991) (recognizing former employee of county office of federal agency had a *Bivens* remedy for claim against federal government officers responsible for his termination); *Dunbar Corp. v. Lindsey*, 905 F.2d 754, 755, 761 (4th Cir. 1990) (recognizing that land purchaser had *Bivens* remedy for claim that federal employees violated his Fifth Amendment rights when they improperly seized his land).

power" to recognize a money damages remedy for constitutional violations

"should not be exercised." *Bush v. Lucas*, 462 U.S. 367, 378 (1983). When an

"administrative system created by Congress 'provides meaningful remedies,'" no

*Bivens* remedy is available, even if the alternatives fail to "'provide complete relief

for the plaintiff.'" *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988) (quoting *Bush*,

462 U.S. at 386, 388). Although the majority and I agree that in deciding whether

to extend a *Bivens* remedy we must consider whether the "existing process is

sufficiently protective," Maj. Op. at 27, we disagree about whether that factor is

met here.

The majority concludes that Alvarez "is in no position to argue that the

elaborate scheme that Congress designed afforded him no opportunity for a

meaningful remedy" because (1) ICE performed two custody determinations and

"in each instance the agency found sufficient grounds to continue detaining him"

and (2) Alvarez was able to petition for a writ of habeas corpus to challenge his

detention.[14] *Id.* at 35-36. But in light of Alvarez's plausible claim that the 180-day

---

[14] The majority discusses that Congress "provided for a host of review procedures tailored to the differently situated groups of aliens that may be present in the United States" and lists both the review procedures under § 241.4 as well as procedures available to aliens applying for asylum, challenging a removal order, or seeking to reopen removal procedures on the basis of newly discovered facts. Maj. Op. at 32-33. I do not dispute that Congress provided a variety of review procedures within an extensive statutory scheme. But aside from the review procedures under § 241.4, which Alvarez alleged Munoz purposefully circumvented, the particular review procedures the majority discusses are irrelevant to whether Alvarez had a meaningful opportunity to challenge his continued detention after his final order of removal.

review Munoz performed was a sham,[15] it cannot be that ICE's periodic review

was sufficiently protective.  Because a habeas proceeding was the only meaningful

way for Alvarez to receive review of his detention, I cannot conclude that

Congress explicitly or implicitly indicated that the courts should refrain from

providing Alvarez a damages remedy.

As I explained above, ICE was required to release Alvarez if, at the 180-day

review, there was "no significant likelihood" that he would "be removed in the

reasonably foreseeable future."  8 C.F.R. § 241.13(c); s*ee id.* § 241.4(i)(7).  In his

decision, Munoz acknowledged that Alvarez's "removal to Cuba is not presently

---

[15] As I noted above, ICE performed a 90-day custody review as well.  But Alvarez has failed to make a plausible allegation that Skinner denied him meaningful review.  When Skinner continued his detention at the 90-day review, she was not required to consider whether there was a significant likelihood that Alvarez would be removed in the reasonable foreseeable future.  *See* 8 C.F.R. § 241.4(i)(7); *Zadvydas*, 533 U.S. at 701.

It is true that at the 90-day review Skinner had discretion to release him if she determined that he posed no danger to the community and was not a flight risk.  8 C.F.R. § 241.4(d)(1).  Although Alvarez alleged in his complaint that Skinner knew he posed no danger to the community or a flight risk, his allegation was only conclusory.  He alleged that he submitted documentation to Skinner "demonstrating that [he] was not a 'flight risk' or a danger to the community."  Am. Compl. at ¶ 65 (Doc. 30).  (Citations to "Doc." refer to docket entries in the district court record in this case).  But the allegation that Alvarez provided some evidence showing he posed no flight risk or danger to the community cannot establish that Skinner knew he posed no danger to the community, especially considering his prior conviction for conspiracy to possess illegal weapons.

Alvarez also contends that Skinner must have known in April 2009 that he posed no danger to the community or flight risk because ICE released him six months later.  I disagree.  Even assuming that when ICE released Alvarez in October 2009, it implicitly determined that he posed no danger to the community and was not a flight risk at that time, his release in no way shows that Skinner knew he was not a danger to the community or a flight risk nearly six months earlier when she decided to continue his detention.  Because Alvarez has failed plausibly to allege that he was denied meaningful administrative review at the 90-day review stage, I agree with the majority's implicit conclusion that he has no *Bivens* remedy arising out of his detention after the 90-day review but before the 180-day review.

57

possible," but found that his removal to Spain would occur in "the reasonably foreseeable future." Decision to Continue Detention (Doc. 34-1); *see* Am. Compl. at ¶ 90 (Doc. 30).[16] Alvarez has alleged, however, that Munoz "knew the statements" about "Alvarez's eligibility for Spanish citizenship and removal to Spain . . . not to be true and only made them to continue to detain and deprive . . . Alvarez of his freedom and liberty." Am. Compl. at ¶ 91 (Doc. 30).

There is no dispute that Alvarez could be removed to Spain only if he were eligible for Spanish citizenship. The application for Spanish citizenship made clear that to be eligible Alvarez had to have an ancestor who fled Spain during the Spanish Civil War from 1936 to 1939. But Alvarez's Spanish ancestor, his grandfather, left Spain more than 60 years before the Spanish Civil War, making Alvarez ineligible for Spanish citizenship.

Alvarez has alleged sufficient facts to state a facially plausible claim[17] that Munoz knew Alvarez was ineligible for Spanish citizenship—and thus could not

---

[16] Like the majority, I consider the content of Munoz's Decision to Continue Detention, Gladish's declaration filed in the habeas action (to the extent it discusses the government's request that Alvarez complete an application for Spanish citizenship), Alvarez's declaration filed in the habeas action (to the extent it discusses the Spanish citizenship application), and similar materials, even though they were attached to the defendants' motion to dismiss, instead of Alvarez's complaint. I acknowledge that "[t]ypically, a Rule 12(b)(6) motion to dismiss must be decided without considering matters outside of or unattached to the complaint," which would preclude us from considering these documents, filed as exhibits to the defendants' motion to dismiss. *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1053 n.12 (11th Cir. 2015). But these documents may be considered because they are (1) "central to a claim in the complaint" and (2) their "authenticity is unchallenged." *Id.*

[17] *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012) (recognizing

58

be removed to Spain—at the time when Munoz decided to continue Alvarez's

detention.  Alvarez pled that an ICE agent provided him an incomplete application

for Spanish citizenship that omitted the pages detailing the requirement that the

applicant must have an ancestor who fled Spain during the Spanish Civil War.

Because these pages would have shown that Alvarez was ineligible for Spanish

citizenship, these allegations support an inference that the agent gave him an

incomplete application knowing, but attempting to hide, that he was ineligible for

Spanish citizenship.  Admittedly, Alvarez has not alleged that Munoz personally

gave him the incomplete application.  But by the time Munoz made the decision to

continue detention, Alvarez had told the habeas court about the incomplete

application and explained why he was ineligible for Spanish citizenship.  Because

Munoz reviewed Alvarez's entire file, including all the materials Alvarez submitted

to the habeas court,[18] it is reasonable to infer that Munoz knew Alvarez was

ineligible for Spanish citizenship and could not be removed.  If Munoz knew

Alvarez could not be removed to Spain, then he had no basis for finding that

Alvarez's removal to Spain would occur in the reasonably foreseeable future and

thus for continuing Alvarez's detention.  In other words, if we accept Alvarez's

_____

that a pleading must "'state a claim to relief that is plausible on its face'" (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

[18] There is no dispute that as part of the 180-day review, Munoz was required to review Alvarez's records.  *See* 8 C.F.R. § 241.4(i)(2).  And Munoz explained in his decision that he had reviewed Alvarez's file, including any information Alvarez had submitted.

well-pled allegations as true, as we must, he was affirmatively prevented from receiving the meaningful review required under the regulations.[19]

Crediting Alvarez's allegation that he was intentionally denied meaningful review by Munoz, I fail to see how Congress has indicated (either implicitly or explicitly) that courts should refrain from recognizing a *Bivens* remedy under these circumstances. The majority asserts that because Congress has amended the Immigration and Naturalization Act and never added a private right of action, we should conclude that Congress intended to make damages unavailable. Maj. Op. at 34-35. Even assuming Congress implicitly indicated (through its silence) that aliens who received meaningful review of their detention at the 90-day and 180-day reviews should have no damages remedy against the federal officials who continued their detention, I see no suggestion by Congress, even by its silence, indicating that Alvarez should have no damages remedy when he alleged that he was affirmatively denied the review the law required.[20] *See Arar v. Ashcroft*,

---

[19] In contrast, Alvarez's allegation that Gladish and Wall knowingly misrepresented to the habeas court his eligibility for Spanish citizenship is unsupported by factual content. Alvarez alleged that Gladish and Wall made knowingly false statements to the habeas court that he would be removed to Spain in the reasonably foreseeable future. But Alvarez has alleged no facts to support his conclusion that at the time Gladish and Wall made these statements they knew that he could not be removed in the reasonably foreseeable future. He has alleged no facts that show (directly or indirectly) that these two defendants knew when Alvarez's grandfather left Spain or that another ICE officer had given Alvarez an incomplete application for Spanish citizenship. Accordingly, even if Alvarez had a *Bivens* remedy against Gladish and Wall, the claims properly were dismissed because he failed to state a plausible claim that they knowingly deprived him of liberty by continuing his detention.

[20] Although the majority says that it leaves for another day the question of whether a

585 F.3d 559, 573 (2d Cir. 2009) (en banc) (explaining that "any reliance on the [Immigration and Nationality Act] as an alternative remedial scheme presents difficulties" because the alien "alleged that he was actively prevented from seeking any meaningful review and relief through the [Immigration and Nationality Act] processes"); *Rauccio v. Frank*, 750 F. Supp. 566, 571 (D. Conn. 1990) ("In the instant case, the plaintiff's due process claim is premised on the defendants' interference with the procedural mechanism which Congress has created . . . . [A]ssuming plaintiff's factual allegations to be true, defendants have rendered effectively unavailable any procedural safeguard established by Congress.").

The majority implicitly takes the position that Alvarez received meaningful review, but it cites no case to support this conclusion. Although the majority relies on the Ninth Circuit's decision in *Mirmehdi v. United States*, 689 F.3d 975 (9th Cir. 2011), to suggest that other circuits have refused to recognize a *Bivens* remedy in the immigration context, nothing in *Mirmehdi* addressed whether a *Bivens* remedy is available when an alien is denied meaningful review through the very

*Bivens* remedy would be available when an alien alleges that he was subject to physical abuse or punitive confinement conditions, Maj. Op. at 31-32 n.6, I fear that courts and litigants in the future may read the majority's broad reasoning to foreclose a *Bivens* remedy for such claims. Yet, other circuits have recognized that a *Bivens* remedy is available for such claims, implicitly rejecting the position that no *Bivens* remedy should ever be available in the immigration detention context. *See, e.g.*, *De La Paz v. Coy*, 786 F.3d 367, 374 (5th Cir.) (explaining that a *Bivens* remedy is available for a claim arising out of civil immigration apprehension or detention alleging unconstitutionally excessive use of force), *reh'g denied*, 804 F.3d 1200 (5th Cir. 2015), *petition for cert. filed*, (U.S. Jan. 26, 2016) (No. 15-888).

administrative procedures that the government asserts make a *Bivens* remedy unnecessary. In *Mirmehdi*, aliens with pending applications for asylum were arrested for immigration violations and then released on bond. *Id.* at 979. Their bond was revoked after FBI and ICE agents testified to evidence showing the aliens supported a terrorist group. *Id.* The aliens claimed the agents knowingly misrepresented evidence as showing that they belonged to the terrorist group so that the immigration judge would revoke their bond. *Id.* The aliens later sued the agents seeking a *Bivens* remedy for their wrongful detention claim.[21]

The Ninth Circuit held that no *Bivens* remedy was available because the aliens were able to "challenge their detention through not one but two different remedial systems." *Id.* at 982. As the Ninth Circuit pointed out, the aliens' claim that the agents fabricated evidence was reviewed multiple times: (1) on direct appeal of their detention, (2) during administrative proceedings related to their asylum applications, and (3) in a federal habeas corpus petition. *Id.* at 979, 982. Importantly, though, in *Mirmehdi* the aliens raised no claim that this administrative and judicial review was a sham. Accordingly, *Mirmehdi* never considered or addressed the question before the Court in this case: whether an alien could have

---

[21] The aliens in *Mirmehdi* ultimately were granted withholding of removal and released because they demonstrated a likelihood of mistreatment if removed to Iran. 689 F.3d at 979-80.

received meaningful administrative review when he alleged that the only review of his claim (in a non-appealable decision, no less) was a sham.[22]

It is true that Alvarez could—and did—challenge his continued detention by petitioning for a writ of habeas corpus in federal court. But given his plausible claim that he was intentionally denied a meaningful 180-day review, petitioning for a writ of habeas corpus was the only way he could obtain review of his continued detention. And the existence of a habeas remedy alone—which gives aliens prospective, as opposed to retrospective, relief—is insufficient to support a conclusion that alternative remedies "amount to a convincing reason to refrain from" recognizing a *Bivens* remedy. *Engel v. Buchan*, 710 F.3d 698, 705-06 (7th

---

[22] The majority's reliance on *De La Paz* is flawed for similar reasons. Although the Fifth Circuit broadly characterized the issue as "whether *Bivens* extends to claims arising from civil immigration apprehensions and detentions, other than those alleging unconstitutionally excessive force," *De La Paz*, 786 F.3d at 375, the Fifth Circuit's analysis never addressed whether a *Bivens* remedy was available when an alien plausibly alleged that he was intentionally denied meaningful review of his unlawful detention. In *De La Paz*, two undocumented aliens, who were arrested by customs and border patrol, sued seeking money damages against the agents, alleging the agents violated their Fourth Amendment rights by performing an illegal stop. *Id.* at 369. In refusing to recognize a *Bivens* remedy, the Fifth Circuit relied on the existing "'[f]ederal governance of immigration and alien status,'" which was "'extensive and complex.'" *Id.* at 375 (alteration in original) (quoting *Arizona v. United States*, 132 S. Ct. 2492, 2499 (2012)). The Fifth Circuit pointed to statutes limiting when border patrol agents may search or arrest a person, statutes guaranteeing aliens certain procedural safeguards after arrest, and regulations requiring the Department of Homeland Security to investigate alleged Fourth Amendment violations. *Id.* at 376. Given this remedial scheme, the Fifth Circuit concluded that "Congress's failure to provide an individual damages remedy 'has not been inadvertent.'" *Id.* at 377 (quoting *Schweiker*, 487 U.S. at 423). But *De La Paz* did not address whether a *Bivens* remedy should be available where the defendants actively prevented the plaintiffs from receiving meaningful review under the applicable statutes and regulations.

Cir. 2013) (internal quotation marks omitted).[23]  Significantly, the government never argues—and no court has held—that a federal court can infer that Congress intended to foreclose a *Bivens* remedy solely from the fact that the plaintiff was able to challenge his unlawful detention or incarceration by petitioning for a writ of habeas corpus.[24]

Accepting Alvarez's allegations, I cannot say that the sole alternative process available to review his unlawful continued detention—that is, petitioning for habeas relief—provides a compelling reason for the Court to refrain from recognizing a damages remedy.  Instead, the existence of habeas review alone is an insufficient basis for concluding that Congress intended to prohibit a damages remedy for Alvarez.

---

[23] When a habeas remedy is coupled with a "broader, integrated remedial scheme" that can meaningfully address the deprivation, then the availability of a habeas remedy weighs against recognizing a *Bivens* remedy.  *Engel*, 710 F.3d at 706; *see also Rauschenberg v. Williamson*, 785 F.2d 985, 987 (11th Cir. 1986) (declining to extend *Bivens* remedy when parolee had alternative remedies available to challenge condition of his parole including, but not limited to, petitioning for habeas corpus relief).  In other words, I am not saying that the availability of a habeas remedy has no significance in a *Bivens* analysis, but when habeas is the only available remedy, a court should not conclude that Congress intended to foreclose a *Bivens* remedy.

[24] The majority also suggests that another alternative was available because Alvarez made an informal request to Skinner that she expedite the 90-day review of his case and release him before the end of the 90-day period.  *See* Maj. Op. at 35.  Given that detention for 90 days after Alvarez's final removal order was mandatory, 8 U.S.C. § 1231(a)(2), I fail to see how this futile request constituted a meaningful alternative remedy.  It is true that Alvarez could have requested release between the 90-day and 180-day reviews on the ground that there was no significant likelihood he would be removed in the reasonably foreseeable future.  8 C.F.R. § 241.13(c), (d)(3).  But under the regulations, the government had "no obligation" to release Alvarez on this basis until six months after his removal order became final.  *Id.* § 241.13(b)(2)(ii).  Given this important limitation, if Alvarez had requested release between the 90-day and 180-day review, the request would have been futile.

## 2. Special Factors Counseling Hesitation

The majority alternatively holds that no *Bivens* remedy is available because "numerous special factors counsel hesitation in this context." Maj. Op. at 36. The majority identifies two special factors in this case: "the importance of demonstrating due respect for the Constitution's separation of powers" and the difficulties associated with recognizing a "doctrinally novel and difficult to administer" claim.[25] *Id.* at 36-37. After careful consideration, I remain unconvinced that either of these special factors cautions hesitation in this case.

### a. Separation of Powers

The majority contends that the need to demonstrate due respect for the separation of powers counsels hesitation here. Of course I agree that the Constitution gives "Congress the power to establish a uniform Rule of Naturalization" and that the Executive Branch has inherent authority to conduct relations with foreign nations. *Id.* at 36-37 (internal quotation marks omitted). But given Alvarez's plausible claim that Munoz knew Alvarez could not be removed, I fail to see how such separation of powers concerns are implicated here. The majority offers no compelling reason why concerns about separation of powers are

---

[25] The majority offers the availability of "adequate remedial mechanisms" under the existing legislative and regulatory framework as a third special factor counseling hesitation. Maj. Op. at 36 (internal quotation marks omitted). But this is merely a restatement of the majority's reasoning that no *Bivens* remedy is available because of existing alternative remedies. As I explained above, given Alvarez's allegation that Munoz intentionally denied him meaningful review, I cannot say that the government provided adequate administrative review or remedial measures.

implicated when an ICE official intentionally deprives a detainee of his due process rights under governing law.

In fact, the government raised, and the Supreme Court rejected, a similar separation of powers argument in *Zadvydas*. The government argued that courts could not review a habeas petition challenging the Attorney General's authority to detain indefinitely aliens who could not be removed because "the Judicial Branch must defer to Executive and Legislative Branch decisionmaking" with respect to immigration law. *Zadvydas*, 533 U.S. at 695. The Court rejected this argument, explaining that the Executive and Legislative Branches' "power is subject to important constitutional limitations." *Id.* When removal is impossible, judicial review of an alien's detention in no way "den[ies] the right of Congress to remove aliens." *Id.* The Court also rejected the government's assertion that judicial review would impinge the authority of Congress and the Executive Branch to control entry into the United States. *Id.* at 695-96. For an alien detained after a final removal order is entered, "[t]he sole foreign policy consideration" is that review by the courts might "interfere with 'sensitive' repatriation negotiations." *Id.* at 696. The government failed to "explain how a . . . court's efforts to determine the likelihood of repatriation, if handled with appropriate sensitivity, could make a significant difference in this respect."[26] *Id.* For the same reasons, I

---

[26] The Court recognized that in cases involving "terrorism or other special

66

am unpersuaded that judicial review of ICE's decision to continue detention in a *Bivens* action would upset the separation of powers when there is a plausible claim that the ICE official performing the review knew that the alien was entitled to release because he could not be removed to any other country.

I am troubled by the majority's separation of powers analysis because, taken to its logical end, it would seem to foreclose a *Bivens* remedy in any case arising in the immigration context. After all, if this case—in which Alvarez alleges that Munoz knew that the government had no country that would accept him—implicates the Executive's power to control and conduct foreign relations, then special factors would counsel hesitation in virtually all immigration cases.

### b.  Workability of Cause of Action

The majority also concludes that special factors counsel hesitation because Alvarez's claim is doctrinally novel and would be difficult to administer. Although the workability of a cause of action may indeed be a special factor counseling hesitation, *see Wilkie*, 551 U.S. at 555-56, I fail to see how Alvarez's claim, alleging that he was deprived due process when Munoz purposefully denied him meaningful review as required by the regulations, would be unworkable. In fact, his particular claim is neither doctrinally novel nor difficult to administer.

---

circumstances," "special arguments might be made for . . . heightened deference to the judgments of the political branches with respect to matters of national security." *Zadvydas*, 533 U.S. at 696. But here the government makes no argument that judicial review of Alvarez's continued detention would implicate national security concerns.

First, I disagree that Alvarez's allegation that he was denied meaningful review of his ongoing detention raises a novel claim. His resembles a classic procedural due process claim, alleging that a government official failed to provide meaningful review as required under a law or policy. *See, e.g.*, *Williams v. Hobbs*, 662 F.3d 994, 1008-09 (8th Cir. 2011) (explaining that inmate failed to receive due process, even though process set forth in policy was adequate, when the review actually provided by prison officials was not meaningful); *Ryan v. Ill. Dep't of Children & Family Servs.*, 185 F.3d 751, 761-62 (7th Cir. 1999) (reversing grant of summary judgment on procedural due process claim based on plaintiffs' evidence showing that hearing was a "sham" because decisionmakers had already made up their minds); *see also Zinermon v. Burch*, 494 U.S. 113, 125 (1990) ("The Due Process clause also encompasses . . . a guarantee of fair procedure."); *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 164 (1951) (Frankfurter, J., concurring) (explaining that due process requires that procedures provided must "not [be] a sham or a pretense" (internal quotation marks omitted)).

The majority suggests that Alvarez's claim is different from other procedural due process claims because a court would have to examine ICE's motivation for continuing his detention. Even though a factfinder ultimately would have to determine whether Munoz knew that Alvarez could not be removed to Spain, I fail to see why this inquiry makes Alvarez's cause of action any different from any

68

other claim based on an intentional deprivation of due process—much less unworkable.  The majority offers no compelling explanation.

The majority further asserts that Alvarez's claim would require us to examine ICE's motivation for continuing the detention of "every other alien who may be detained past the statutory 90-day period."  Maj. Op. at 38.  Again, I disagree.  Alvarez makes no claim that ICE or Munoz had a policy or practice of performing sham 180-day reviews to continue to detain aliens; why then would a court need to consider the reasons why ICE continued to detain other aliens beyond the 180-day review?

Second, I cannot agree with the majority's assertion that Alvarez's claim would be difficult to administer.  The majority suggests that because ICE has discretion to abandon removal proceedings at any time, it would be particularly difficult to understand ICE's motivations for continuing a detention beyond the 180-day period.  These two things are like apples and oranges:  discretion to abandon removal proceedings altogether and discretion to continue detention after a final order of removal are two very different things.  Further, as the majority concedes, Alvarez "does not allege that ICE should have exercised its discretion [to abandon removal proceedings] and released him."  *Id.* at 25.  Rather, Alvarez alleges that after the 180-day review, ICE denied him due process by failing to release him when it was required to do so because his removal was not reasonably

foreseeable. *See Zadvydas*, 533 U.S. at 699-700; 8 C.F.R. §§ 241.4(i)(7), 241.13(c). Accordingly, I think that the Attorney General's discretion to abandon removal proceedings poses no problem in this case.

The majority worries that recognizing a *Bivens* remedy "would likely lead to widespread litigation" from aliens challenging their continued detention, Maj. Op. at 39, but I believe their concerns are overstated. Recognizing a *Bivens* remedy in this case would open the courthouse doors only to claims from aliens who: (1) were subject to a final order of removal, (2) were still detained at the end of the 90-day removal period, (3) had their detention continued at the 90-day review, (4) had their detention continued at the 180-day review, and (5) can state a plausible claim that the ICE official performing the 180-day review knew that the alien could not be removed in the reasonably foreseeable future. It is hard to believe this group of aliens is so large that they would flood the courts with litigation.[27] In any event, even assuming the majority is correct that a large group of aliens can plausibly allege that they received sham 180-day reviews, the concern that federal

---

[27] Indeed, the available data suggests this group of aliens is relatively small. In 2006, the government detained a total of 8,690 aliens nationwide after a final order of removal was entered. Only 1,725 of those aliens were detained 90 days after their final order was entered. *See* Office of Inspector General, ICE's Compliance with Detention Limits for Aliens with a Final Order of Removal from the United States 11 (2007). The *Bivens* remedy I would recognize in this case would be available to only a subset of the latter group of aliens. And perhaps if a *Bivens* remedy were available to aliens whom ICE intentionally unlawfully detained, the existence of such a remedy would have a deterrent effect, reducing the numbers further.

courts may have to address these plausible claims of serious constitutional violations hardly provides a compelling reason to refrain from hearing such claims.

I also remain unpersuaded by the majority's contention that recognizing a *Bivens* remedy here would "chill ICE officials from engaging in robust enforcement of this country's immigration laws." *Id.* at 39.  Because the *Bivens* remedy I would recognize here would apply only to claims against those ICE officials who intentionally deny an alien a meaningful 180-day review, I fail to see how the prospect of the narrow judicial review I am proposing would chill ICE officials from performing their legitimate duties.

In sum, I cannot agree with the majority's special factors analysis.  Because I would hold that the alternative, existing processes were inadequate, and special factors do not counsel hesitation, I would extend Alvarez a *Bivens* remedy.

## B. *Heck v. Humphrey*

The district court dismissed Alvarez's claims against all defendants, including Munoz, on the alternative ground that "the 'favorable termination rule' imposed by *Heck*" barred his claims.  Order at 16 (Doc. 58).  In *Heck*, the Supreme Court recognized:

> [T]o recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a

state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.

*Heck*, 512 U.S. at 486-87 (footnote omitted). Accordingly, the Court imposed a favorable-termination requirement, barring a damages action that "would necessarily imply the invalidity of [a] conviction or sentence . . . unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." *Id.* at 487. We previously explained that the favorable termination requirement is inapplicable when "federal habeas corpus is not available." *Harden v. Pataki*, 320 F.3d 1289, 1299 (11th Cir. 2003);[28] *see also Spencer v. Kemna*, 523 U.S. 1, 21 (1998) (Souter, J., concurring) ("[A] former prisoner, no longer 'in custody,' may bring a[n]. . . action establishing the unconstitutionality of a conviction or confinement without being bound to satisfy a favorable-termination requirement that it would be impossible as a matter of law for him to satisfy.").[29]

Although Alvarez seeks damages arising from his unconstitutional continued detention, he cannot demonstrate that his detention has been declared invalid because the habeas court never issued a writ that called into question his detention. Nonetheless, I would hold that the favorable-termination requirement is

---

[28] We have in unpublished decisions suggested that this analysis in *Harden* was dicta. *See, e.g.*, *Vickers v. Donahue*, 137 F. App'x 285, 288-90 (11th Cir. 2005) (unpublished). Even if the discussion in *Harden* is non-binding, however, the Court should adopt *Harden's* well-reasoned analysis.

[29] We have never addressed whether *Heck's* rule applies to aliens who challenge their immigration detention as unconstitutional. I assume for purposes of my analysis that *Heck* can apply to such claims.

72

inapplicable because under the facts of this case federal habeas review was unavailable to Alvarez. Alvarez diligently petitioned for a writ of habeas corpus; indeed, the district court scheduled a hearing on his petition. But the government's decision to release him just two business days before the hearing (quite possibly in an attempt to avoid judicial review of the unconstitutional detention) mooted his habeas petition challenging his detention[30] and made it impossible for him to obtain habeas relief that called into question his ongoing detention. Given this unique (and frankly troubling) procedural history, it would be illogical and unjust to hold that Alvarez's claim against Munoz is barred because he failed to obtain habeas relief. Accordingly, I would hold that the district court erred in dismissing Alvarez's claim against Munoz as barred under *Heck*.

## C. Qualified Immunity

The district court held in the alternative that Alvarez's claims were properly dismissed because all the defendants, including Munoz, were entitled to qualified immunity. I disagree with the district court's analysis because it failed to consider that Alvarez's procedural due process claim included the plausible allegation that Munoz intentionally deprived him of meaningful review.

---

[30] *See Dawson v. Scott*, 50 F.3d 884, 886 n.2 (11th Cir. 1995). Alvarez continued to seek habeas relief by challenging the conditions of release imposed by the government, which he contended restricted his freedom of action or movement, but his challenge did not address his lengthy detention. *See Alvarez v. Holder,* 454 F. App'x 769, 772-73 (11th Cir. 2011) (unpublished).

A government official asserting a qualified immunity defense bears the initial burden of showing "he was acting within his discretionary authority."[31] *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007).  After the official makes this showing, the burden shifts to the plaintiff to show that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation."  *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004).  Binding decisions of the Supreme Court may clearly establish a right.  *See McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007).  The clearly-established requirement "ensures that officers will not be liable for damages unless they had "fair warning" that their conduct violated the law."  *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

Alvarez has stated a claim that Munoz violated his Fifth Amendment right to procedural due process by intentionally depriving Alvarez of meaningful review.[32] A procedural due process claim has three elements "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) [government] action; and

---

[31] Alvarez does not challenge the district court's conclusion that each defendant was carrying out a discretionary function at the time of the alleged constitutional violations.

[32] Alvarez also brought a Fourth Amendment claim against Munoz.  But the Fourth Amendment claim fails because ICE had probable cause to detain him when it lodged the immigration detainer.  The Supreme Court has explained that a challenge to continued detention is better understood as a Fifth Amendment due process claim than as a Fourth Amendment illegal seizure claim.  *See Baker v. McCollan*, 443 U.S. 137, 144 (1979) (recognizing that there is a due process violation when a person is "detained indefinitely in the face of repeated protests of innocence even though the warrant under which he was arrested and detained met the standards of the Fourth Amendment").

74

(3) constitutionally-inadequate process." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003). The only element at issue here is whether Alvarez received constitutionally inadequate process. As discussed in part in Section II-A above, Alvarez has pled sufficient facts to allege that he received constitutionally inadequate process when Munoz performed a sham review.

Further, Alvarez's constitutional right was clearly established at the time that Munoz performed the sham 180-day review. Although due process may be "a flexible concept that varies with the particular circumstances of each case," we have recognized that it is "clear that the government must provide" review "in a meaningful manner." *Id.* at 1232-33 (internal quotation marks omitted); *see Zinermon*, 494 U.S. at 125 (due process requires "a guarantee of fair procedure"); *McKinney v. Pate*, 20 F.3d 1550, 1561 (11th Cir. 1994) (en banc) ("It is axiomatic that, in general, the Constitution requires that the state provide fair procedures and an impartial decisionmaker before infringing on a person's interest in life, liberty, or property."). Given this precedent, it can hardly be argued that Munoz lacked fair warning that performing a sham 180-day review would violate Alvarez's due process rights.

### D. Statute of Limitations

The district court also dismissed Alvarez's claims on the alternative ground that they were barred by the statute of limitations. Alvarez's cause of action

against Munoz accrued on or around October 14, 2009—when he received

Munoz's decision to continue his detention—because at that point he knew or had

reason to know of his injury.[33]  *See Mullinax v. McElhenney*, 817 F.2d 711, 716

(11th Cir. 1987).  Alvarez sued Munoz less than four years later.  Because it is

unclear from the face of the complaint which state has the most significant

relationship to Alvarez's claim, it is impossible to determine at the motion to

dismiss stage which state's statute of limitations applies and thus whether

Alvarez's claim was timely.  Accordingly, the district court erred in dismissing the

claim against Munoz on statute of limitations grounds.

"A Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate if

it is apparent from the face of the complaint that the claim is time-barred."

*Gonsalvez v. Celebrity Cruises Inc.*, 750 F.3d 1195, 1197 (11th Cir. 2013) (internal

quotation marks omitted).  Because "[a] statute of limitations bar is an affirmative

defense,  . . . plaintiff[s] [are] not required to negate" the affirmative defense in

their complaint.  *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir.

2004) (alterations in original and internal quotation marks omitted). The district

court's statute of limitations analysis is flawed because it failed to consider

---

[33] Alvarez argues that his claim did not accrue until we issued a decision regarding his habeas claim.  *See Alvarez v. Holder*, 454 F. App'x 769 (11th Cir. 2011) (unpublished).  Alvarez wrongly assumes that our decision on his habeas claim held his detention unconstitutional.  But we never addressed the legality of his immigration detention, only the conditions of his supervised release.  *Id.*

whether it was apparent from the face of the complaint that the claim was time-barred.

The statute of limitations for Alvarez's *Bivens* action is "the state limitation period applicable to personal injury actions" in the state where the suit was filed. *Kelly v. Serna*, 87 F.3d 1235, 1238 (11th Cir. 1996).  Alvarez filed suit in Florida, so Florida law determines the limitation period.  Florida courts generally apply a four-year statute of limitations to personal injury actions.  Fla. Stat. § 95.11(3). But if a cause of action arose in another state with a shorter statute of limitations, Florida law requires use of the shorter statute of limitations.  *Id.* § 95.10 ("When the cause of action arose in another state or territory of the United States, . . . and its laws forbid the maintenance of the action because of lapse of time, no action shall be maintained in this state.").  The purpose of this statute "is to discourage 'forum shopping' and the filing of lawsuits in Florida that have already been barred in the jurisdiction where the cause of action arose."  *Celotex Corp. v. Meehan*, 523 So. 2d 141, 143 (Fla. 1988).

Under Florida law, a cause of action arises in the state with the most significant relationship to the action.  *Id.* at 144.  Florida courts "presume[] that the law of the place of the injury will apply"; if, however, "another state has a more 'significant relationship' to the particular issue, that state's law should be applied."  *McNeil v. CSX Transp., Inc.*, 832 So. 2d 227, 229 (Fla. Dist. Ct. App. 2002).  To

77

decide which state has the most significant relationship, Florida courts consider the following criteria:

(a)    the place where the injury occurred,

(b)    the place where the conduct causing injury occurred,

(c)    the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and

(d)    the place where the relationship, if any, between the parties is centered.

*Celotex*, 523 So. 2d at 144. (quoting Restatement (Second) of Conflict of Laws § 145(2) (1971)).

In this case, whether Alvarez's claim against Munoz is barred depends on where his cause of action arose. Munoz claims that Alvarez's cause of action arose in Georgia and is barred by Georgia's two-year statute of limitations. *See* O.C.G.A. § 9-3-33. Alvarez claims that it is unclear from the face of the complaint which state's law governs his claim and that it is possible that Florida's four-year statute of limitations applies, making his claim timely. Applying the significant factors test, I agree with Alvarez that it is not apparent from the face of his complaint which state had the most significant relationship to his cause of action against Munoz and thus whether his claim was barred.

Alvarez's complaint shows that both Florida and Georgia had a relationship to Alvarez's cause of action. Alvarez has alleged that his injury occurred in

78

Georgia where he was detained and that Florida was his state of residence for over 50 years. But the complaint is silent about other contacts relevant to the significant-relationship analysis, including where Munoz resided; where Munoz's conduct causing Alvarez's injury occurred, for example, where Munoz made the decision to continue Alvarez's detention; and the place where the parties' relationship was centered. Because I cannot conclude from the face of the complaint that Alvarez's claim necessarily is time-barred, dismissal on statute of limitations grounds was error at this stage of the proceeding.

## III.    Conclusion

The allegations in this case are disturbing. They suggest that an ICE official ignored the law, intentionally deprived Alvarez of meaningful review, and knowingly made false statements to keep him in custody when the law required him to be released. The majority's analysis in this case is also troubling. To deny a *Bivens* remedy, the majority seems to cast aside the motion to dismiss standard by ignoring Alvarez's well-pled allegation that Munoz purposefully denied him meaningful review under the existing regulations and procedures. After properly applying the motion to dismiss standard and crediting Alvarez's plausible allegations, I would recognize that Alvarez has a *Bivens* remedy for his due process claim against Munoz. I would also hold that the district court erred in its alternative conclusions that *Heck v. Humphrey*, qualified immunity, and the statute

of limitations barred Alvarez's claim.  I dissent because I would allow Alvarez's

claim against Munoz to proceed.